685 A.2d 151

**COMMONWEALTH of Pennsylvania**

v.

**Donald J. BLASIOLI, Appellant.**

Superior Court of Pennsylvania.

Submitted July 8, 1996.

Filed Nov. 7, 1996.

208

210

Timothy P. Dawson, Adamsburg, for appellant.

Wayne B. Gongaware, Assistant District Attorney, Greensburg, for Commonwealth, appellee.

Before HUDOCK, SCHILLER, and MONTEMURO*, JJ.

SCHILLER, Judge.

Appellant appeals from the order of the Court of Common Pleas of Westmoreland County denying his post-sentence motions regarding his conviction on August 18, 1995, of one count each of rape,[1] indecent assault,[2] simple assault,[3] and unlawful

---

* Retired Justice assigned to the Superior Court.

1. 18 Pa.C.S. § 3121.

restraint.[4] Appellant was sentenced to 4–8 years on the rape count,[5] and 6–12 months (concurrent) on the simple assault and unlawful restraint counts. We affirm.

FACTS:

The appellant was convicted of a rape that occurred on May 4, 1993, at approximately 11:00 P.M. on a poorly lit roadway near the city of Jeannette. The assailant covered the eyes of the victim during the attack, then smoked a cigarette before departing. Seminal fluid from the victim and a "Bel–Aire" cigarette butt were recovered from the scene. On September 25, 1993, Trooper Kenneth Karas of the Pennsylvania State Police visited appellant's home to discuss this assault. The appellant admitted that he smoked "Bel–Aire" cigarettes, and provided a saliva sample for the officer. This saliva sample was then tested by the Pennsylvania State Police laboratory, and indicated that the appellant had type A blood. The cigarette butt had previously been tested and was found to have come from someone with type A blood. Based on this information, on October 15, 1993, Trooper Karas secured a search warrant to obtain samples of appellant's blood, head hairs, chest hairs and pubic hairs. DNA tests were then performed by the Pennsylvania State Police laboratory on the blood sample taken from the appellant and the semen sample obtained from the victim, and these were found to match. Appellant was arrested on February 15, 1994.

Prior to trial, the court held a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), to determine the admissibility of statistical evidence derived from DNA tests performed on the blood sample taken from the appellant and the semen sample obtained from the victim. The court heard the testimony of several expert witnesses and concluded that the two primary statistical methods, the product rule and the

2. 18 Pa.C.S. § 3126.

3. 18 Pa.C.S. § 2701.

4. 18 Pa.C.S. § 2902.

5. The indecent assault conviction merged with the rape conviction.

ceiling principle, met the test of general acceptance in the scientific community and were admissible.[6]

The DNA evidence introduced at trial showed that the samples taken from the victim and from the appellant matched. Depending on which statistical method was used, the chances of another genetic match were either 1 in 2,220; 1 in 30 million, or 1 in 10 billion.

The jury found the appellant guilty on all counts. Sentence was imposed on September 28, 1995. Appellant filed a post-sentence motion on October 10, 1995, which was denied on February 8, 1996. This appeal followed.

DISCUSSION:

Appellant raises six issues on appeal: (1) whether the taking of the appellant's saliva by Trooper Karas was an unconstitutional search under the United States and Pennsylvania Constitutions; (2) whether the trial court erred in refusing to strike three prospective jurors for cause; (3) whether the Commonwealth was required to have its DNA experts prepare written summary reports for use by appellant; (4) whether the trial court erred in admitting the DNA statistical evidence of the Commonwealth; (5) whether the trial court erred in refusing to admit a report compiled by appellant's expert; and (6) whether the appellant's right to a fair trial was prejudiced by the trial judge's remark regarding the qualifications of appellant's expert.

Appellant's first argument is that the trial court erred in denying his motion to suppress the saliva evidence introduced at trial. Appellant contends that this evidence was obtained via a search that violated his rights under the United States Constitution [7] and the Pennsylvania Constitution.[8]

6. The appellant's expert also testified about a third method, known as the counting rule.

7. The Fourth Amendment to the U.S. Constitution provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

When reviewing a ruling of the trial court regarding a motion to suppress evidence, "an appellate court must first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom." *Commonwealth v. Gommer,* 445 Pa.Super. 571, 573, 665 A.2d 1269, 1270 (1995), *alloc. denied,* 1996 Pa. Lexis 1484 (July 22, 1996) (citation omitted). If the evidence supports the suppression court's findings, "we are bound by such findings and may only reverse if the legal conclusions drawn therefrom are in error." *Commonwealth v. Gommer, supra,* at 573, 665 A.2d at 1270 (citation omitted). *See also Commonwealth v. Miller,* 541 Pa. 531, 555, 664 A.2d 1310, 1322 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996).

When a defendant files a motion to suppress, the burden is on the Commonwealth to prove, by a preponderance of the evidence, that the challenged evidence is admissible. Pa.R.Crim.P. 323; *Commonwealth v. Benton,* 440 Pa.Super. 441, 444, 655 A.2d 1030, 1032 (1995), citing *Commonwealth v. DeWitt,* 530 Pa. 299, 301, 608 A.2d 1030, 1031 (1992). However, on appeal from a decision denying suppression, our scope of review is limited and we must consider only the Commonwealth's evidence and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Epoca,* 447 Pa.Super. 183, 185, 668 A.2d 578, 579 (1995), *alloc. denied,* 544 Pa. 623, 675 A.2d 1243 (1996).

In addressing appellant's argument, the threshold question is whether the taking by the police officer of saliva from appellant constituted a "search," thereby triggering the

U.S. Const. amend. IV.

8. Article 1, § 8 of the Pennsylvania Constitution provides:
The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or thing shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.
Pa. Const. Art. 1, § 8.

constitutional protections of the Fourth Amendment and Article 1, § 8. A search "is an examination of a man's house, buildings or of his person, with a view to the discovery of contraband or some evidence of guilt to be used by the prosecution for a criminal action." *Commonwealth v. Anderson,* 208 Pa.Super. 323, 326–27, 222 A.2d 495, 498 (1966) (citation omitted). Not all searches raise constitutional concerns; it is only "when the government intrudes on an area where a person has a 'constitutionally protected reasonable expectation of privacy'" that an issue is raised under the Fourth Amendment and Article 1, § 8. *Commonwealth v. Robbins,* 436 Pa.Super. 177, 184, 647 A.2d 555, 558 (1994), quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The United States Supreme Court has set forth a two part test to determine if a search occurred: (1) whether a person exhibited an actual expectation of privacy; and (2) whether such an expectation was one that society is prepared to recognize as reasonable. *Katz v. United States, supra.*

Whether the taking of saliva constitutes a search appears to be a question of first impression in Pennsylvania.[9] Previously, the taking of blood, breath, and urine samples have been held to constitute searches under both the United States Constitution and the Pennsylvania Constitution. *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1833–34, 16 L.Ed.2d 908 (1966) (blood); *Skinner v. Railway Labor Exec. Assn.,* 489 U.S. 602, 616–17, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989) (breath and urine); *Com., Dept. of Transp. v. McFarren,* 514 Pa. 411, 417, 525 A.2d 1185, 1188 (1987) (blood, breath and urine). The foundation of these decisions was a recognition of the purpose of the constitutional protections, i.e., "to protect personal privacy and dignity against unwarranted

---

**9.** But *see Commonwealth v. Young,* 524 Pa. 373, 572 A.2d 1217 (1990), where the Supreme Court upheld a search warrant issued for the blood, hair and saliva of the defendant. The Court held that the warrant was not overly broad and was justified by probable cause. *See also Commonwealth v. Graves,* 310 Pa.Super. 184, 456 A.2d 561 (1983) which upheld the taking of defendant's hair and saliva samples despite the illegality of the arrest. It may have been assumed in these cases that the taking of saliva constituted a search.

intrusion by the State." *Schmerber, supra,* at 767, 86 S.Ct. at 1833–34.

■ We believe that a person has an expectation of privacy that includes the taking of his saliva, as he does with his blood, breath, and urine. As one court remarked, "[s]uch a scenario, wherein a citizen is directed to submit to an intrusion into his body, is properly viewed as implicating his dignitary interests." *United States v. Nicolosi,* 885 F.Supp. 50, 55 (E.D.N.Y. 1995). Therefore, we hold that the taking of saliva from an individual by a police officer constitutes a search under the Fourth Amendment of the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution.[10]

■ Next we must determine whether the saliva sample was taken pursuant to the requirements of the United States and Pennsylvania Constitutions. According to the Supreme Court, "a search or seizure is not reasonable unless it is conducted pursuant to a search warrant issued by a magistrate upon a showing of probable cause." *Commonwealth v. Kohl,* 532 Pa. 152, 166, 615 A.2d 308, 315 (1992). However, a warrant is not required if the person voluntarily consents to the search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 242–43, 93 S.Ct. 2041, 2055–56, 36 L.Ed.2d 854 (1973); *Commonwealth v. Latshaw,* 481 Pa. 298, 303, 392 A.2d 1301, 1304 (1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979). In order for the consent to be valid, it must be "unequivocal, specific, and voluntary." *Commonwealth v. Gibson,* 536 Pa. 123, 132, 638 A.2d 203, 207 (1994). The burden is upon the Commonwealth to prove by clear and convincing evidence that a valid consent was given by appellant. *Commonwealth v. Pichel,* 229 Pa.Super. 103, 106, 323 A.2d 113, 114 (1974). See *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

---

**10.** We join the following courts outside of Pennsylvania in so holding. See *United States v. Nicolosi,* 885 F.Supp. 50 (E.D.N.Y.1995); *Henry v. Ryan,* 775 F.Supp. 247 (N.D.Ill.1991); *State v. Ostroski,* 201 Conn. 534, 518 A.2d 915 (1986); *State v. Reeves,* 234 Kan. 250, 671 P.2d 553 (1983). *But see State v. Zuniga,* 320 N.C. 233, 357 S.E.2d 898, *cert. denied,* 484 U.S. 959, 108 S.Ct. 359, 98 L.Ed.2d 384 (1987) (taking of saliva is unintrusive and therefore not a search).

Appellant contends that the consent given to the officer for the saliva sample was obtained by coercion. For consent to be valid, it must be given free from coercion, duress or deception. *See e.g. Commonwealth v. Burgos*, 223 Pa.Super. 325, 329, 299 A.2d 34, 37 (1972); *Commonwealth v. Slaton*, 530 Pa. 207, 215, 608 A.2d 5, 9 (1992); *Commonwealth v. Gibson*, *supra*, at 132, 638 A.2d at 207. The question of whether consent was voluntarily given is one circumstances. *Commonwealth v. Washington*, 438 Pa.Super. 131, 137–38, 651 A.2d 1127, 1130 (1994), *alloc. denied*, 541 Pa. 638, 663 A.2d 690 (1995) (citations omitted). This Court has held that the following factors should be considered in determining whether consent was voluntarily given: "the setting in which the consent was obtained; what was said and done by the parties present; [and] the age, intelligence, and educational background of the person consenting." *Commonwealth v. Burgos, supra*, at 330, 299 A.2d at 37.

The facts surrounding the taking of the saliva sample in this case are as follows: On Saturday September 25, 1993, Trooper Karas of the Pennsylvania State Police visited appellant at his home at approximately 7:00 P.M. The officer, who was not in uniform,[11] identified himself as a police officer and asked to speak to the appellant. He told appellant that he was investigating a sexual assault and that the appellant was a suspect, but that the appellant did not have to speak to him. Appellant agreed to speak to the officer and invited him into his home. The two sat at appellant's dining room table during the course of their meeting.[12] During their conversation, the officer asked if the appellant had tank tops and shorts. Appellant answered yes, and the officer asked appellant if he could see them. Appellant then went into his bedroom and retrieved those items. The officer did not follow him but remained seated at the table during the time he was in appellant's apartment. The officer asked appellant if he would provide

11. The officer testified that he was armed but at no time did he mention this to appellant nor show his firearm. There is also no evidence that appellant knew the officer was armed during their meeting.

12. Appellant testified that the meeting lasted two hours; the officer testified that it lasted fifty minutes.

blood and hair samples, which appellant refused. The officer then asked appellant if he would provide a saliva sample. Appellant agreed, and expectorated into a piece of paper. It was from the testing of this saliva sample that the police were able to link appellant to the sexual assault for which he was eventually convicted, and were able to secure a search warrant to take blood and hair samples from the appellant.

Appellant contends that the officer told him he would be arrested if he did not cooperate with the officer. As a result, appellant testified that he felt scared and threatened by the officer, and cooperated out of fear of being arrested. The officer denied ever making such statements, and testified that he did tell appellant that appellant could terminate the meeting at any time. The officer also testified that he asked appellant to give a voluntary saliva sample, and informed appellant that he did not have to do so.

On this evidence the suppression court found that the appellant was not coerced by the officer into providing the saliva sample. Given our limited scope of review, we have no basis upon which to upset this determination. *See Commonwealth v. Epoca, supra.* We have held that "it is the sole province of the suppression court to weigh the credibility of the witnesses." *Commonwealth v. Benton, supra,* at 445, 655 A.2d at 1032. In addition, the suppression court judge "is entitled to believe all, part or none of the evidence presented." *Id.* Deference should be given to the decision of the suppression court since "that court had a firsthand opportunity to observe the appearance and demeanor of the witnesses, and therefore, to evaluate the credibility of the witnesses." *Commonwealth v. Graves, supra,* at 189, 456 A.2d at 564.

Moreover, on this record we agree with the suppression court's conclusion. First, we note that appellant was not under arrest or taken into police custody at the time he gave the consent: he had the right to ask the officer to leave, or to cease questioning at any time. *See* generally *Commonwealth v. Burgos, supra,* at 330, 299 A.2d at 37. Second, appellant was aware of why the officer was there and was informed by

the officer that he was investigating a crime where appellant was a suspect.[13] Finally, appellant's claim that he felt coerced into giving a saliva sample is contrary to his actions immediately prior to his expectoration, when he declined to give a blood or hair sample. Therefore, the court acted properly in denying appellant's motion to suppress the saliva sample.[14]

The next allegation of error is that the trial court improperly denied challenges for cause for three jurors during the voir dire process. Appellant argues that his counsel was forced to use three of his seven peremptory challenges on prospective jurors who should have been excused for cause, and as a result he exhausted his peremptory challenges before the jury was seated.

When a criminal defendant is forced to use a peremptory challenge to excuse a juror who should have been excused for cause, and as a result exhausts his peremptory challenges before the jury is seated, a new trial will be granted. *Commonwealth v. Impellizzeri*, 443 Pa.Super. 296, 305, 661 A.2d 422, 426–27 (1995). The standards for dismissing a juror for cause are well settled:

> A challenge of a prospective juror should be sustained in two types of situations. One is where the juror indicates by his answers that he will not be an impartial juror. Another is when the juror has such a close relationship, familial, financial or situational, with the parties, counsel, victims or witnesses that the court will presume a likelihood of prejudice, **irrespective of** the answers given on void dire.

13. As a result, this case can be distinguished from *Commonwealth v. Gibson*, 536 Pa. 123, 638 A.2d 203 (1994), where the Supreme Court ruled that the consent to search was not voluntarily given when the police did not announce the reason for their appearance at the defendant's apartment.

14. As the search for the saliva sample satisfied the constitutional standards of the Fourth Amendment and Article I, § 8, we need not address appellant's "fruit of the poisonous tree" argument concerning evidence later obtained by a search warrant that relied primarily on the results of the tests done on the saliva sample. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Commonwealth v. Nelson*, 488 Pa. 148, 411 A.2d 740 (1980).

*Commonwealth v. Perry,* 441 Pa.Super. 409, 412, 657 A.2d 989, 990 (1995).

██ The three jurors at issue in this case have been designated by their voir dire numbers, i.e. Juror No. 25, Juror No. 34, and Juror No. 48. Each was challenged for cause but the basis of each challenge was different. Juror No. 25 was an engineer whose job involved analyzing data. He testified on direct that he would be inclined to accept DNA data as valid unless shown a reason to question it. The trial judge asked, "Would you be able and capable of questioning anything that was testified to in this case if you were given a basis upon which to question it?" The juror answered "Yes." The trial judge then pressed further: "You would put yourself in a position of questioning and holding whoever made a statement to the ultimate proof, wouldn't you?" The juror again answered "Yes." N.T. August 11, 1995, 160. Nonetheless, defense counsel moved to strike this juror, prompting the trial court to remark: "That will be denied because I can't think of somebody that would make a better juror for this kind of case then a guy who does this on a daily basis. Tim [appellant's counsel], I think, frankly, he's the kind of guy you want." Appellant's counsel replied "Might be," to which the trial court responded: "From the point of view of your expert that you are intending on bringing in here, he's the kind of guy that's going to listen to it intelligently and understand what's being said and weigh both sides." Appellant's counsel agreed, saying, "That's why I said I didn't know what to do with him. I'm just protecting the record." N.T., August 11, 1995, 155–62.

██ Juror No. 34 testified that he had read several articles regarding this crime and others like it. He admitted that from his reading of the newspapers, he had developed a bias that the person arrested for this crime, the defendant, might have been involved in the crime. The trial court then asked: "[W]hat was reported in the papers consisted of accusations and what is in the criminal information consists of accusations and as I instructed you previously, the presumption of innocence applies in this case as it does in all cases. Would you be

able to accept that concept, the presumption of innocence, and require the Commonwealth to prove this case beyond a reasonable doubt before you would find Mr. Blasioli guilty of the offenses in this regard?" Juror No. 34 answered "Yes, I would." Appellant's counsel then asked the juror if he would do everything he could to set aside his feelings about this case, and the juror answered, "I would try to do my best to do so and I would promise Your Honor that I would make every effort to do just that. Now, obviously, I can't absolutely say at this point that I would be successful. I'm not sure that I can say that, but I would try." The court then asked the juror: "Let me ask you this [Juror No. 34], would you do everything that you were capable of doing to meet your oath as a juror." Juror No. 34 responded "Absolutely." When the defense moved to strike for cause, the trial court responded "I think he had indicated what's necessary on the record here and that is he would do everything he is capable of doing of meeting his oath and I think that's what we require of jurors. We don't require perfection of jurors. Okay. So I'm going to deny the challenge for cause." N.T., August 11, 1995, 176–82.

 Juror No. 48 testified that the prosecutor's wife was her family doctor and that she worked at the same hospital as the prosecutor's wife. Although she had seen the prosecutor on a few occasions in social settings at the hospital, such as fundraisers, they had not interacted. The court asked: "[D]o you promise that you will do your best to set aside that relationship and not let it affect the verdict in this case?" Juror No. 48 responded "Yes. I am a very honest person and would do my best." When appellant's counsel moved to strike Juror No. 48, the trial court responded, "First of all, based upon the responses of the juror and based upon my consideration of her testimony, I am convinced that she will be an impartial juror, that she will be objective and that she will not allow the fact that Mr. Fox's [the prosecutor's] wife is her family physician to intrude upon her responsibilities as a juror. I think she understands the distinction that has to be made and will make that distinction. So, the challenge for cause will be denied." N.T., August 11, 1995, 78–86.

 The burden of proving that a prospective juror should be excused for cause "is on the challenger who must demonstrate that [the prospective juror] possesses a fixed, unalterable opinion that would prevent him or her from rendering a verdict based solely on the evidence and the law." *Commonwealth v. Smith, supra,* at 36, 540 A.2d at 256, citing *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

 In reviewing a trial court's action regarding jury selection, great deference is afforded to the trial judge, who "is in the best position to assess the credibility of the jurors and their ability to be impartial." *Commonwealth v. Impellizzeri, supra,* at 306, 661 A.2d at 427. His determination is based on the juror's answers and demeanor, and will not be reversed absent a "palpable abuse of discretion." *Commonwealth v. Marshall,* 534 Pa. 488, 497, 633 A.2d 1100, 1104 (1993). *See also Commonwealth v. Perry, supra,* at 412, 657 A.2d at 990. The mere fact that jurors may show some indicia of pretrial prejudice is not enough to require that they be stricken from the jury. "We do not expect jurors to be free from all prejudices ... rather, the law requires them to be able to put aside their prejudices and determine guilt or innocence on the facts presented." *Commonwealth v. Smith,* 518 Pa. 15, 36, 540 A.2d 246, 256 (1988).

In this case, none of the three jurors showed a "fixed, unalterable opinion." Juror No. 25 stated he would question any evidence if given a reason to do so. Juror No. 34 stated that he would try to the best of his ability to be objective and not let what he read about the case in the newspapers affect his judgment. Juror No. 48 stated she would set aside her relationship with the prosecutor's wife and not let it affect her decision, and her patient-physician relationship with the wife of the prosecutor did not rise to the level where the trial court

could have presumed the likelihood of prejudice.[15]

■ Appellant's next issue is whether his rights to a fair trial and effective assistance of counsel were violated by the trial court's denial of his request to have the Commonwealth produce written summaries of its experts' proposed testimony. During the discovery phase, the appellant requested all documents relating to the Commonwealth's experts. The appellant does not allege that the Commonwealth failed to produce these documents; instead, he argues that the Commonwealth should have been required to produce summary reports explaining the experts' findings.[16] We find no support in the Pennsylvania Constitution, the Rules of Criminal Procedure or Pennsylvania case law for such a requirement.

In criminal matters, the applicable discovery rule is contained in the Pennsylvania Rules of Criminal Procedure, which provides that the Commonwealth shall disclose to the defendant's attorney

> results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant, which are within the possession or control of the attorney for the Commonwealth.

Pa.R.Crim.P. 305(B)(1)(e).

■ Rule 305 requires disclosure of only those reports within the possession or control of the Commonwealth. *Commonwealth v. McElroy*, 445 Pa.Super. 336, 347, 665 A.2d 813, 818 (1995), *alloc. denied*, 544 Pa. 610, 674 A.2d 1073 (1996).

---

15. This relationship is significantly different than the one in *Commonwealth v. Perry*, 441 Pa.Super. 409, 657 A.2d 989 (1995), where this Court held that the trial court should have excused a potential juror for cause when that juror testified that he was best friends with the arresting police officer and that he had no doubts regarding the officer's veracity. These facts created a likelihood of prejudice that could not be ignored despite the juror's testimony that he could be impartial and assess the officer's credibility on the same basis as the credibility of the other witnesses.

16. As the appellant stated "These DNA prosecutions should mandate that the defendant be provided with expert reports compiled by proposed Commonwealth experts even if this requires the actual preparation of a report for trial." Brief for Appellant at 35.

However, the rule is inapplicable here, as the reports in question never existed, and hence could not have been within the possession or control of the Commonwealth.[17]

Moreover, in *Commonwealth v. Kelly*, 365 Pa.Super. 28, 528 A.2d 1346 (1987), *alloc. denied*, 517 Pa. 598, 535 A.2d 1057 (1987), a case involving a DUI conviction, this Court held that the prosecution was not required to have its expert prepare a written report relating to his interpretation of the defendant's blood alcohol tests. Though there are significant differences between tests for blood alcohol and tests for DNA,[18] neither the Constitution nor Rule 305 requires that the Commonwealth have its experts create written reports to summarize their testimony for the benefit of the defendant.

■ Appellant next argues that the trial court erred in finding that the Commonwealth's DNA statistical evidence was derived from methods which were generally accepted within the scientific community. The standard employed in Pennsylvania to determine whether new types of scientific evidence may be admitted comes from the test first laid down in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923):

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field to which it belongs.

17. According to the Supreme Court, the purpose of Rule 305 is to avoid "trial by ambush" by allowing the parties to be prepared for trial. *Commonwealth v. Shelton*, 536 Pa. 559, 564–65, 640 A.2d 892, 895 (1994). We fail to see how appellant could have been ambushed by the Commonwealth when it failed to produce reports that never existed.

18. As appellant argues, "The providing of expert reports is especially critical in a DNA prosecution where complex scientific evidence is utilized by the Commonwealth in a case of this nature where the victim cannot I.D. the defendant as her perpetrator." Brief for Appellant at 35.

*Frye* was adopted as the standard in Pennsylvania in *Commonwealth v. Topa*, 471 Pa. 223, 231, 369 A.2d 1277, 1281 (1977), and is the standard we use today.[19]

Our analysis of the use of DNA evidence, and the methods that produce it, must begin with the Supreme Court's decision in *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994). *Crews* held that DNA testing has gained general acceptance in the scientific community.[20] *Id.* at 519–20, 640 A.2d at 400–01. What *Crews* left unanswered was whether statistical methodology using DNA test results have general acceptance and

19. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that the *Frye* test was no longer the standard to be used in federal courts. The Court held that *Frye* was superseded by the Federal Rules of Evidence. Under the rule of *Daubert*, scientific evidence is admissible if it relates to "scientific knowledge," i.e. the evidence must have a reliable foundation in science, and is relevant. Thus, the "general acceptance" standard of *Frye* is no longer the threshold required in federal cases.

As the Pennsylvania Supreme Court noted in *Commonwealth v. Crews*, 536 Pa. 508, 518, 640 A.2d 395, 400 n.2 (1994), *Daubert* was an interpretation of the Federal Rules of Evidence and does not control determinations of Pennsylvania law. The Supreme Court stated, "[w]hether or not the rationale of *Daubert* will supersede or modify the *Frye* test in Pennsylvania is left to another day." *Id.* The parties in this case do not argue that *Daubert* controls this case, and the trial court applied *Frye* in making its determination. We have found no case that has accepted the *Daubert* rule over the *Frye* rule. *See McKenzie v. Westinghouse Elec. Corp.*, Pa.Cmwlth., 674 A.2d 1167, 1170 n. 4 (1996). Accordingly, we will continue to adhere to the *Frye* test.

We do note, however, that if the *Daubert* standard controlled this case, we agree with the trial court that there would be little doubt that the DNA statistical evidence in this case would be admissible. N.T., August 15, 1995, 208. This evidence is derived from the use of scientific methods, and is clearly relevant and would assist the trier of fact in determining a fact in issue.

20. In addition to DNA, Pennsylvania courts have applied the *Frye* test of general acceptance to other types of scientific evidence. *See e.g. Commonwealth v. Khamphouseane*, 434 Pa.Super. 93, 642 A.2d 490, *alloc. denied*, 538 Pa. 666, 649 A.2d 669 (1994) (human leukocyte antigen blood tests); *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992), *cert. denied*, 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993) (blood electrophoresis tests); *Commonwealth v. McCauley*, 403 Pa.Super. 262, 588 A.2d 941 (1991), *alloc. denied*, 529 Pa. 656, 604 A.2d 248 (1992) (microscopic hair comparisons).

hence would be admissible under *Frye*. According to the Supreme Court:

> Statistical analysis of DNA evidence remains a major objective of forensic scientists. It may be that the standards for statistical analysis are now sufficiently accepted among experts to satisfy the *Frye* test, and some courts have so held. *E.g., United States v. Jakobetz,* 747 F.Supp. 250 (D.Vt.1990); *Perry v. State,* 586 So.2d 236 (Ala.Ct.Crim.App.1990); *Andrews v. State,* 533 So.2d 841 (Fla.Dist.Ct.App.1988); *State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990); *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989); *Glover v. State,* 787 S.W.2d 544 (Tex.App.1990); *Spencer v. Commonwealth,* 240 Va. 78, 393 S.E.2d 609 (1990); *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989); *Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436 (1990); *State v. Pennell,* 584 A.2d 513 (Del.Super.Ct.1989). We hold merely that the record compiled in this case does not include evidence sufficient to satisfy *Frye,* though an exhaustive *Frye* hearing might reach a different result.

*Id.* at 522, 640 A.2d at 402 n. 4.

In this case, unlike in *Crews,* there was a significant amount of testimony regarding the methods of computing DNA statistical evidence.[21] The trial court conducted a hearing at which the Commonwealth presented three experts on DNA testing and the appellant produced one expert. The trial court then determined that two statistical methods (known as the "product rule" and the "ceiling principle") met the *Frye* test of general acceptance, and allowed testimony regarding the results derived from these methods. Appellant is now challenging the admissibility of evidence derived from the "product rule" method.

At this point it is necessary to provide some background into DNA testing and the use of statistical evidence.[22] The

21. There was no evidence in *Crews* regarding any possible statistical probabilities.

22. The information about DNA and the statistical methods is derived from several sources, including the trial record and the following cases:

Court in *Crews* explained the purpose of DNA testing in criminal cases:

> The relevance of the DNA analysis, in criminal law generally, and in the context of this case, is to establish the identity of the source of a DNA sample discovered at a crime scene. If the DNA sample from the crime scene matches the DNA sample of the accused, it is at least evidence that the DNA discovered at the crime scene is that of the accused. If the DNA sample matches the DNA of the accused **and no one else**, then it, of course, conclusively establishes that the accused is the source of the DNA found at the scene of the crime. This distinction is expressed in terms of a statistical probability of the match occurring randomly in the population. A DNA expert might testify that a given DNA match will occur only once in a population of 10,000,000. Obviously, such a probability makes it highly likely that the DNA samples came from the same source. If the DNA expert's testimony, however, is that a given match might occur coincidentally once in every one hundred samples, then it is far weaker in establishing the sources of the DNA samples as being one and the same individual.
>
> Thus, in terms of the inferential conclusion to be drawn from DNA evidence in a criminal trial—the accused as source of the DNA sample found at the crime scene—DNA analysis generally can provide only statistical probability; e.g., there is one chance in four hundred or one chance in four million that the DNA sample came from someone else. Conversely, a DNA **mismatch** constitutes conclusive and certain scientific proof that the DNA samples come from different sources. For proving identity, however, as opposed to disproving identity, DNA can never provide absolute, conclusive proof, even though extremely low probabili-

*Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996); *State v. Morel*, 676 A.2d 1347 (R.I.1996); *State v. Streich*, 658 A.2d 38 (Vt.1995).

ties of a coincidental match provide a basis for very strong inferences of identity.

*Commonwealth v. Crews, supra,* at 520–21, 640 A.2d at 401.

Human genetic information is encoded in deoxyribonucleic acid (DNA) and is contained in the 23 pairs of chromosomes found in all body cells that contain nuclei. The DNA molecule is shaped like a double helix and is comprised of 3 billion base pairs composed of four different chemicals (known as nucleotides): adenine (A), cytosine (C), thymine (T), and guanine (G). It is the particular combination of these nucleotides that determine an individual's genetic code. A strand of DNA contains an estimated 50,000 to 100,000 genes, and an individual genetic characteristic may be made up of tens of thousands of nucleotides. A gene is found at a specific site (known as locus) on a specific chromosome. For example, a gene for hair color is found at the same site on the same chromosome in every individual. For each genetic characteristic, there may be two or more variations or forms of the controlling gene, known as alleles. Each parent contributes one copy of each gene, so every individual has two copies or alleles of each gene.

As 99% of DNA molecules are the same for all humans,[23] DNA profiling focuses on those areas of the DNA molecule where there is significant differentiation in the length of the base pairings, and there are approximately three million differences in the DNA between two randomly selected individuals. These areas of variation are called "polymorphisms," and the basic core sequence is called a Variable Number Tandem Repeat (VNTR). What is examined in DNA analysis is the length of the total DNA fragment, determined by the total number of base pairs of nucleotides, which is directly related to the number of times the particular DNA core sequence is repeated.

A DNA sample must first be "prepared" prior to it being analyzed. The process used by the Pennsylvania State Police and generally used across the country to prepare a DNA

---

**23.** Identical twins have exactly the same DNA.

sample for analysis is called the restriction fragment length polymorphism analysis (RFLP). According to one court, the steps taken in this analysis are:

> First, a whole DNA strand is cut into smaller pieces using restriction enzymes, which are essentially chemical "scissors" designed to cut the DNA chain wherever a particular sequence of nucleotides is found. The result is a mass of DNA fragments of various size. The second step is to separate these fragments according to their size. This is accomplished by passing a current through a gel medium containing the DNA. The fragments are negatively charged, so they will migrate toward a positive electrode. Their progress towards the electrodes will vary depending on their size, and the fragments will spread out across the gel. Using a process known as Southern Blotting, these fragments are transferred from the gel to paper and washed with a radioactive material that attaches itself to the DNA fragments. When the paper is placed against a sheet of film, the radioactive material exposes areas of the film, producing a discernible patterns of dark bands. This "picture" is known as an autoradiograph. Each band on the autoradiograph represents a fragment of DNA. Finally, these banding patterns can be used for identification by comparing the banding pattern in the suspect's DNA with the pattern derived from the DNA extracted from crime scene evidence.

*Armstead v. State,* 342 Md. 38, 673 A.2d 221, 228 (1996). *See also United States v. Jakobetz,* 747 F.Supp. 250 (D.Vt.1990), *aff'd,* 955 F.2d 786 (2d Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). After the autoradiograph is created, a visual comparison is made between the sample taken and known samples. If there is no visible match on the autoradiograph, the suspect is eliminated as a contributor of further compared with the samples in the Pennsylvania database to see if particular genetic alleles match. The Pennsylvania lab focuses on six different areas on chromosomes to

determine matches.[24] A mechanical measurement is then taken at each locus to determine if the DNA sample from the suspect and the sample from the victim fall within a specified length, defined by the Pennsylvania lab as plus or minus 2.5% of the sample length. If both DNA samples fall within that length, they are considered a match.[25]

Once a match is found for all six loci, statistical analysis is then used to determine the likelihood that someone other than the suspect would possess DNA that would match the DNA found in the sample taken from the crime scene. There are two main statistical methods used to determine the probability of a genetic match. The first is the "product rule," which was admitted in this case and is the subject of appellant's challenge. This is the most straightforward method of computation. The separate estimated probabilities of the occurrence of each allele is calculated and then multiplied together. In essence, the product rule means that the probability of three events occurring together is equal to the probability that the first event will occur multiplied by the probability that the third event will occur. As an example, if three alleles are examined, and the first has a probability of 5%, the second of 10% and the third of 20%, the product rule would show that the chances that another individual would share this profile is 1 in 1,000 (1/20 * 1/10 * 1/5).

The validity of the product rule depends on whether the alleles are statistically independent. If the three alleles in the example given above are dependant or linked, then the mathematical probability of 1 in 1,000 would be inaccurate, as there would be a significant probability that an individual who has one allele would have two or more of the alleles. For exam-

24. Those areas are Chromosome 1, D1S7; Chromosome 2, D2S44; Chromosome 4, D4S139; Chromosome 5, D5S110; Chromosome 10, D10S28; and Chromosome 17, D17S29. The number after the "S" designates a particular area on that chromosome. N.T., August 14, 1995, 37–38.

25. According to *Crews*, "the scientific processes carried out in a laboratory to compare DNA samples are now routine and fully accepted in the scientific community." *Commonwealth v. Crews, supra*, at 520, 640 A.2d at 400–01. *See also Commonwealth v. Rodgers*, 413 Pa.Super. 498, 605 A.2d 1228, *alloc. denied*, 532 Pa. 655, 615 A.2d 1311 (1992).

ple, suppose that the three alleles described above relate to whether an individual has blond hair, blue eyes, and fair skin. If the probability of having all three traits is interrelated, so that a person who has blue eyes is more likely to be blond, then the genetic characteristics are interrelated. In such a case, the likelihood of a match would be more probable than 1 in 1,000.

One factor that influences the possibility of interrelated genes is whether the database population intermarry or "mate" at random. If one subsection of the population tends to mate within that same subsection, then the likelihood that genetic characteristics are interrelated increases. Such selective mating causes population substructures, and it is unknown to what, if any, extent they exist. The product rule relies on an assumption that population groups mate randomly across different racial groups, i.e. that no population substructures exist. In an attempt to avoid the potential problem of population substructures, the Pennsylvania database, as do most databases, categorizes DNA samples according to three racial groups: Caucasian, African–American, and Hispanic. The PA database has approximately 1140 samples: 500 Caucasians, 330 African Americans and 310 Hispanics. This database was compiled largely from the three major metropolitan areas of the Commonwealth, and no samples were derived from Westmoreland County.[26]

---

**26.** Though appellant does not specifically challenge the composition of the state police's database, a database with an insufficient number of samples would certainly present difficulties in analysis. However, Dr. Robert Farrell, professor of human genetics at the University of Pittsburgh, examined the database employed by the state police laboratory and concluded that the Pennsylvania database is sufficiently large to give reasonable estimates of the occurrence of alleles in the population of Western Pennsylvania. N.T., August 14, 1995, 80. He detected no glaring differences between the Pennsylvania database and those used by several other states and the FBI. For example, the FBI has used samples from 225 FBI agents for its Caucasian database. *United States v. Jakobetz,* 955 F.2d 786 (2d Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. Bonds,* 12 F.3d 540 (6th Cir.1993). It appears as though courts require a database of approximately 200–250 samples per racial group. *See People v. Shi Fu Huang,* 145 Misc.2d 513, 546 N.Y.S.2d 920 (County Ct. 1989) (200 samples); *Andrews v. State,* 533 So.2d 841 (Fla.Dist.Ct.App.1988) (200–250 sam-

The Pennsylvania State Police laboratory also tries to avoid the substructure problem by using a process known as "fixed binning" to categorize the alleles contained in its databases. The alleles in the databases are sorted into groups or "bins," whereby each bin represents an observed range of allele lengths (one bin may contain samples where the measurement size is between 640 and 740 base pairs, then another bin would contain samples measuring between 740 and 840 base pairs, and so on). By counting how frequently alleles in the population sample fall within a specific bin, the likelihood that a match will be coincidental can be calculated. For example, in a database of 300 individuals, if thirty of these individuals fit into a particular bin for a particular allele, that bin is said to have a 10% occurrence within the population. This method is also used by the FBI and other laboratories.[27]

As one court noted, the fixed bin process results in a more conservative probability for two reasons:

First, if a given bin contains fewer than five individuals, that bin is "collapsed" into an adjoining bin. As a result, the percentage of the population with an allele within this predetermined bin will be higher than it would be otherwise, and the ultimate statistical probability calculation will be more conservative. Second, if a suspect's allele length for a particular probe falls in between two bins, it will be assigned to the bin with the greater frequency figure, ostensibly generating a conservative statistical probability. This conservatism is said to make up for any inaccuracies due to the presence of population substructures.

*State v. Streich,* 658 A.2d 38, 45 (Vt.1995).

The second statistical methodology used is known as the "ceiling principle," and was recommended in 1992 by the

ples); *State v. Sivri,* 231 Conn. 115, 646 A.2d 169 (1994) (300 samples). There is no problem of an insufficient database here where the the Pennsylvania database has over 300 samples for each racial group.

27. Christine Tomsey, the director of the DNA laboratories for the Pennsylvania State Police, testified that the only way the fixed bin process used by the Pennsylvania laboratory differs from the way it is used by the FBI is that the laboratory uses its own database and not that of the FBI. N.T., August 14, 1995, 19.

National Research Council [NRC], a subdivision of the National Academy of Sciences. Unlike the product rule, this method assumes that population substructures exist. In using the ceiling principle, the 95 percent upper confidence limit for the estimated allele frequencies is first computed for each of the existing population groups: i.e., for the three racial groups in the Pennsylvania database. Then, the largest of these estimates, or 10 percent, whichever is greater, is used to compute the joint probability of a coincidental match on the DNA profile of the crime sample. The resulting probabilities are then multiplied as in the product rule computations. The upper confidence limit in the ceiling principle is intended to account for population substructures by erring in a conservative direction.[28]

During the *Frye* hearing in this case, the Commonwealth introduced the testimony of Christine Tomsey, the director of the DNA laboratories for the Pennsylvania State Police. She testified that the DNA evidence obtained from the appellant matched the DNA evidence obtained from the victim.[29] She also testified that in doing the statistical analysis, the Pennsylvania laboratory used the product rule with the fixed bin process, which she stated was commonly used in this country. N.T., August 14, 1995, 19. Subsequently, at trial, she testified that the chances of finding another genetic match using the product rule were one in ten billion, N.T., August 16, 1995, 448, and the probability under the 1995, 455.

Also during the *Frye* hearing, the Commonwealth introduced the testimony of Dr. Robert Farrell, professor of human genetics at the University of Pittsburgh, and Dr. Bernard Devlin, professor of statistics at Carnegie–Mellon University.

28. In the context of a criminal investigation, the results derived under the "ceiling principle" would be considered more favorable to the defendant. *See e.g. State v. Morel*, 676 A.2d 1347, 1353 (R.I.1996).

29. Ms. Tomsey also testified that the Pennsylvania State Police lab had an error rate of zero: no errors had ever been detected. N.T., August 16, 1995, 410. This evidence was necessary in order for the jury to have an accurate representation of the true probabilities. Proper handling of the sample, in conformity with established procedures, is essential before the DNA evidence can be considered reliable.

Both testified that the product rule method was generally accepted in the scientific community, and Dr. Farrell felt that the lab's estimates in this case were in general conservative due to the fixed bin process they used.

The appellant introduced the testimony of Dr. Lawrence Mueller, a professor of Ecology and Evolutionary Biology at the University of California at Irvine. He testified that there was a significant problem with the product rule because it assumes that the populations have been randomly mating for some time, which according to him is a dubious assumption that can skew the results dramatically. Nor could it be double-checked, as the probabilities produced by the product rule far exceed the number of people in a given database. N.T., August 14, 1995, 118–19. Dr. Mueller argued that the product rule was not generally accepted in the scientific community. N.T., August 14, 1995, 131–32. He testified that he used an analysis known as the "counting method," and determined that the chances of another match were 1 in 2,220. N.T., August 14, 1995, 135.

At the conclusion of the *Frye* hearing, the trial court found that both the product rule and the ceiling principle were generally accepted in the scientific community, and allowed evidence regarding both methods. N.T., August 15, 1995, 206–08. At trial, the jury heard statistical evidence that the chances of a match to someone other than the appellant were one in ten billion [using the product rule], one in thirty million [using the ceiling principle], and 1 in 2,220 [using the counting method].

Over the past six years, a major debate has been raging in the scientific community as to which statistical method to employ in the courtroom: the product rule or the ceiling principle. As seen, in 1992 the NRC recommended the use of the ceiling principle. However, since that time, it has been argued that the ceiling principle is too conservative by under-estimating the frequency of a DNA profile, and that the problem of population substructures has been overstated and does not result in significant variations of allele frequencies

across population subgroups.[30] In fact, the NRC reexamined this issue earlier this year at the request of the FBI and concluded:

> The abundance of data in different ethnic groups within the major races and the genetically and statistically sound methods recommended in this report imply that both the ceiling principle and the interim ceiling principle are unnecessary.

The Evaluation of Forensic DNA Evidence, at 5–35 (National Research Council 1996), quoted in *State v. Morel,* 676 A.2d 1347, 1353 (R.I.1996).

Given this state of mind in the scientific community and the evidence produced at the *Frye* hearing, we do not think that the trial court erred in admitting the statistical evidence based on the product rule that the chances of another match were 1 in 10 billion.[31] This comports with the acceptance of the product rule in many jurisdictions. *United States v. Jakobetz,* 955 F.2d 786 (2d Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. Davis,* 40 F.3d 1069 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995); *United States v. Coronado–Cervantes,* 912 F.Supp. 497 (D.N.M.1996); *People v. Smith,* 46 Cal.App.4th 1412, 49 Cal.Rptr.2d 608, *review granted,* 52 Cal.Rptr.2d 464, 914 P.2d 1239 (1996); *Lindsey v. People,* 892 P.2d 281 (Colo.1995); *People v. Miller,* 173 Ill.2d 167, 219 Ill.Dec. 43, 670 N.E.2d 721 (August 2, 1996); *Armstead v. State,* 342 Md. 38, 673 A.2d 221 (1996); *People v. Chandler,* 211 Mich.App. 604, 536 N.W.2d 799 (1995); *State v. Weeks,* 270 Mont. 63, 891 P.2d 477 (1995); *State v. Anderson,* 118 N.M.

---

**30.** For example, *see* Eric S. Lander & Bruce Budowle, DNA Fingerprinting Dispute Laid to Rest, 371 Nature 735 (Oct. 27, 1994).

**31.** We note several decisions that have allowed statistical evidence of similarly small probabilities. *See e.g. Spencer v. Commonwealth,* 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1171, 107 L.Ed.2d 1073 (1990) (1:134 million); *Andrews v. State,* 533 So.2d 841 (Fla.Dist.Ct.App.1988) (1:800 million); *State v. Dinkins,* 462 S.E.2d 59 (S.C.1995) (1:2.9 billion); *People v. Shi Fu Huang,* 145 Misc.2d 513, 546 N.Y.S.2d 920 (County Ct.1989) (1:20 billion); *Trimboli v. State,* 826 S.W.2d 953 (Tex.Crim.App.1992) (1:54 billion); *Martinez v. State,* 549 So.2d 694 (Fla.Dist.Ct.App.1989) (1:234 billion).

284, 881 P.2d 29 (1994); *State v. Futrell,* 112 N.C.App. 651, 436 S.E.2d 884 (1993); *Taylor v. State,* 889 P.2d 319 (Okla. Crim.App.1995); *State v. Morel,* 676 A.2d 1347 (R.I.1996); *State v. Dinkins,* 462 S.E.2d 59 (S.C.1995); *Spencer v. Commonwealth,* 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1171, 107 L.Ed.2d 1073 (1990); *State v. Copeland,* 130 Wash.2d 244, 922 P.2d 1304 (1996).[32]

Appellant has not challenged the trial court's decision admitting evidence of the ceiling principle statistics, and therefore our focus on this appeal is not on that particular method. However, we note that it was within the discretion of the trial court to admit both types of evidence, and allow the jury to hear the different probabilities and weigh the credibility of those numbers.[33]

Therefore, the trial court did not err in finding that the product rule was generally accepted in the scientific community, and this decision is not precluded by the Supreme Court's decision in *Commonwealth v. Crews, supra.*

Appellant's next issue is that the trial court erred in refusing to admit at trial a report prepared by defense's expert, Dr. Lawrence Mueller. The report in question was prepared by Dr. Mueller and demonstrated the results of his application of the NRC recommendations regarding the counting method and the ceiling principle. Dr. Mueller's testimony at trial came in via a videotape made during the *Frye* hearing. During the *Frye* hearing, the report at issue was admitted by

**32.** We recognize that several of these decisions allowing use of the product rule were decided under the less demanding relevance standard of *Daubert* and not the generally accepted standard of *Frye.* In addition, there are jurisdictions that have rejected the use of the product rule. *See e.g. State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); *State v. Pennell,* 584 A.2d 513 (Del.Super.Ct.1989); *United States v. Porter,* 618 A.2d 629 (D.C.App.1992); *Commonwealth v. Lanigan,* 419 Mass. 15, 641 N.E.2d 1342 (1994); *State v. Vandebogart,* 139 N.H. 145, 652 A.2d 671 (1994); *State v. Streich,* 658 A.2d 38 (Vt.1995).

**33.** This was approved by the courts in *Armstead v. State,* 342 Md. 38, 673 A.2d 221, 243 (1996), and *People v. Soto,* 48 Cal.App.4th 924, 35 Cal.Rptr.2d 846, 858–59 (1994), *as modified,* 48 Cal.App.4th 924, 35 Cal.Rptr.2d 846 (1994), *review granted,* 39 Cal.Rptr.2d 406, 890 P.2d 1115 (Cal.1995).

the trial court without objection by the Commonwealth. However, after the videotape testimony of Dr. Mueller was shown at trial, the Commonwealth objected to the report's admission, arguing that an improper foundation was given. The trial court agreed, and ruled that the report was inadmissible.

Evidentiary rulings "are committed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *Commonwealth v. Cohen,* 529 Pa. 552, 563, 605 A.2d 1212, 1218 (1992). In addition, the admissibility of expert testimony is also within the sound discretion of the trial court. *Commonwealth v. Petrovich,* 538 Pa. 369, 372, 648 A.2d 771, 772 (1994).

Appellant contends that any objection to this report was waived by the Commonwealth failing to object during the *Frye* hearing. However, this argument fails for two reasons. First, while it is true that the Commonwealth did not object to the introduction of the report during the *Frye* hearing, appellant's counsel did not indicate at the time of the offer that this report was also to be offered for admission at trial.[34] Second, it is the responsibility of the trial court to rule on the admissibility of evidence. These rulings occur at the time the evidence is being offered. The fact that the record was admitted for the limited purposes of the *Frye* hearing (i.e. to show that the Commonwealth's product rule evidence was not generally accepted) has no bearing on the report's admissibility for the trial, when clearly its purposes are not so limited.[35]

34. Appellant's counsel only said "I would offer Defense Exhibit G in into evidence at this time." The trial court then asked if there was any objection, and when the Commonwealth's attorney answered no, the court admitted the document. N.T. August 14, 1995, 135.

35. Appellant's reliance on *School Dist. of Philadelphia v. Friedman,* 96 Pa.Cmwlth. 267, 276, 507 A.2d 882 (1986) is misplaced. In that case, there was an objection at trial to the videotaped deposition of a witness that was played before the jury. The objection was based on the lack of a proper foundation for the testimony to be considered expert testimony. The court ruled that the objection was untimely, and needed to have been made at the time of the deposition. *Id.,* at 276, 507 A.2d at 886 n. 1. However, in this case, the objection goes to the admissibility of the report, which, unlike the qualifications of the expert in *Friedman,* could only be made at the trial and not at the *Frye* hearing.

The trial court sustained the objection on the basis that Dr. Mueller did not testify to all of the facts and conclusions contained in the report.[36] It is well established that an expert witness may not state a conclusion which is based on evidence not found in the record. *Commonwealth v. Rounds,* 518 Pa. 204, 209, 542 A.2d 997, 999 (1988). The purpose of this requirement is to enable the factfinder to "determine whether to accept or reject the opinion testimony, based upon, inter alia, whether it believes the facts upon which the opinion is based." *Commonwealth v. Brown,* 408 Pa.Super. 246, 251–52, 596 A.2d 840, 842–43 (1991), *alloc. denied,* 532 Pa. 660, 616 A.2d 982 (1992). The Supreme Court noted:

> At the heart of any analysis [by the jury] is the veracity of the facts upon which the conclusion is based. Without the facts, a jury cannot make any determination as to validity of the expert's opinion. To hold otherwise would result in a total and complete usurpation of the jury's function in our system of justice.

*Commonwealth v. Rounds, supra,* at 209, 542 A.2d at 999.

The report consisted of the conclusions of Dr. Mueller regarding his DNA analysis. The trial court found that there was no testimony regarding how Dr. Mueller obtained these numbers from his DNA tests. As a result, the admission of the report would place Dr. Mueller's conclusions before the jury without the jury also having before it the facts on which Dr. Mueller based these conclusions.

In addition, the trial court thought that admission of the report would be "confusing and indecipherable to the

---

**36.** In its post-trial opinion, the trial court explained:

> this Court sustained the Commonwealth's objection to the admission of Dr. Mueller's report on the basis that Mueller failed to testify to all of the facts and conclusions contained in the report, and that the admission thereof would be confusing and indecipherable to the jury. Because the jury did not have the benefit of expert testimony to explain the technical references and scientific data in the report, it would have been inappropriate for them to have the unintelligible report to consider. Accordingly, the expert report was properly excluded from evidence as unreliable hearsay evidence.

Slip Opinion, *Commonwealth of Pennsylvania v. Donald J. Blasioli,* Court of Common Pleas of Westmoreland County, No 638 C 1994 at 12.

jury." Slip opinion, *supra,* at 12. It is well established that only expert testimony which assists the jury is admissible, *Commonwealth v. Terry,* 513 Pa. 381, 399, 521 A.2d 398, 407 (1987), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987), and the trial court has broad discretion in making this determination. *Sprague v. Walter,* 441 Pa.Super. 1, 39, 656 A.2d 890, 909 (1995), *alloc. denied,* 543 Pa. 695, 670 A.2d 142 (1996). Therefore, it was not an abuse of discretion by the trial court in refusing to admit Dr. Mueller's report.

■ Appellant's final allegation of error is that he was denied the right to a fair trial due to an allegedly prejudicial remark by the trial judge.

During the *Frye* hearing, after an examination of the qualifications of appellant's expert witness, Dr. Lawrence Mueller, appellant moved to have Dr. Mueller qualified as an expert to testify about DNA statistical analysis. The trial court responded "Well, I'm going to permit him to testify, but just barely, so proceed." N.T. April 14, 1995, 114–15. This remark was supposed to have been edited out before the videotape of Dr. Mueller's testimony at the *Frye* hearing was played before the jury at trial, but due to an error by the video technician it was not, and so was heard by the jury. Prior to the playing of the videotape, the judge told the jury that Dr. Mueller was qualified as an expert, and that the jury could consider his opinions as well as his facts. Then, in giving his closing instructions to the jury, the judge instructed the jury to disregard his remark:

> This is a cautionary instruction. At the time that Dr. Lawrence Mueller was being qualified as an expert witness, I made what might be characterized as a gratuitous comment. I qualified Dr. Mueller as an expert, and then I spoke the word barely. Please disregard my statement. Dr. Mueller, along with Ms. Arrotti, Ms. Tomsey, Dr. Far-

rell, has been qualified to testify as an expert, and you should consider his testimony in that regard.

N.T. April 18, 1995, 828.

A trial judge should act with absolute impartiality. *Commonwealth v. Webster*, 517 Pa. 578, 583, 539 A.2d 804, 806 (1988). However:

> Every unwise or irrelevant remark made in the course of a trial by a judge, does not compel the granting of a new trial. **A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.**

*Commonwealth v. Webster, supra,* at 583, 539 A.2d at 806–07, quoting *Commonwealth v. Goosby,* 450 Pa. 609, 611, 301 A.2d 673, 674 (1973).

The comment by the judge, though improper, did not rise to the level of depriving the appellant a fair trial in this case. The remark concerned the qualifications of Dr. Mueller as they related to his expert testimony, and did not impinge on the witness' credibility. *See Commonwealth v. Leonhard,* 336 Pa.Super. 90. 95, 485 A.2d 444, 446 (1984).[37] Finally, we note that the trial judge did give a cautionary instruction to the jury to disregard that remark. As the judge made it clear to the jury that the remark was not binding on the jury, and that they were to consider the testimony of Dr. Mueller as they would the testimony of the Commonwealth's experts, any harm to the defense was cured. *Commonwealth v. Jones,* 539 Pa. 222, 233, 651 A.2d 1101, 1107 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 113, 133 L.Ed.2d 65 (1995). As a result, the trial judge's remark did not deny defendant a fair trial.

---

**37.** As a result, this case is different than *Commonwealth v. Webster,* 517 Pa. 578, 539 A.2d 804 (1988), where the Supreme Court held that the trial judge's remark that there were other witnesses more qualified to testify about the defendant's sanity than defendant's expert deprived the defendant of a new trial.

## CONCLUSION:

We conclude that (1) the taking of the appellant's saliva was a search, but was a permissible one as the appellant voluntarily consented to provide the sample; (2) the trial court did not err in refusing to strike three prospective jurors for cause; (3) the Commonwealth was not required to have its DNA experts prepare written summary reports for use by appellant; (4) DNA statistical evidence derived from the product rule was properly admitted as the trial court could find that it is generally accepted in the scientific community; (5) the trial court properly excluded a report by appellant's expert because the report contained material not testified to by the expert and hence contained opinions based on facts not on the record; and (6) the trial judge's remark regarding the qualifications of appellant's expert did not prejudice the appellant so as to deny him a fair trial.

Consequently, the order of the Court of Common Pleas of Westmoreland County is affirmed.

HUDOCK, J., concurs in the result.