COMMONWEALTH of Pennsylvania, Appellee

v.

**Norman HUNTER, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 16, 2008.

Filed Dec. 31, 2008.

---

Kelly Davis, Public Defender, Philadelphia, for appellant.

Suzan Wilcox, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: BENDER, DONOHUE and FREEDBERG, JJ.

OPINION BY BENDER, J.:

¶ 1 Norman Hunter appeals from the March 5, 2005 judgment of sentence of an aggregate of four to ten years' imprisonment imposed following his convictions of theft receiving stolen property, burglary, and identity theft. Appellant challenges the denial of his motion to suppress evidence seized during a search of his bedroom, conducted while he was a parole violator. We affirm.

¶ 2 The trial court set forth the following facts of the instant case:

On November 19, 2003 at approximately 8:00 a.m., Complainant, Lisa Barday, arrived at work. She was employed as [a] receptionist for Herman Miller, Inc., located on the second floor at 1818 Market Street, Philadelphia. As was her custom, she placed her personal belongings, which included her purse, underneath her work station, tucked near her printer.

Approximately two hours later, Ms. Barday went to her purse and noticed that her wallet was missing. She immediately notified the building security and police, as well as her credit card companies. Several credit cards, a driver's license and cash were in Ms. Barday's wallet. Thereafter, four unauthorized attempts had been made for the opening of a line of credit in Ms. Barday's name.

The next day, November 20, 2003, Thomas Roden, who was an IBM employee, was at Liberty Plaza on the 1600 block of Market Street in Philadelphia. He arrived at the building between 7:30 and 8:00 a.m. After placing his belongings in one of the board rooms, he went to another room to work on a project.

At approximately noon, Mr. Roden was on his way to lunch when he realized that his wallet was missing. He immediately called the police. Shortly thereafter, Mr. Roden was notified by his bank that there had been unusual activity on his credit card. His wallet contained cash, several work and personal credit cards, his social security card and driver's license.

Thereafter, an application for a credit card from "The Children's Place" was prepared utilizing his personal information, including his address. In addition, a Pennsylvania Identity Card utilizing his address was taken out.

In the fall of 2003, Andrew McGowan and Kathleen Perillo were employed by Towers Perrin, Foster & Cosby, with offices at 1500 Market Street. Both Mr. McGowan and Ms. Perillo worked on the 21st floor. Entry to the floor was obtained by either an access card or a visitor's pass.

The day before Thanksgiving, November 26, 2003, Mr. McGowan had arrived at work and placed his wallet in the drawer of his work station early in the morning. He was away from his desk for several hours. When he prepared to leave for lunch, Mr. McGowan noticed that his wallet was missing. He notified his employer's security service and the police.

As with the other complainants, Mr. McGowan had cash, credit cards, business cards and his driver's license in his wallet. He had to cancel his credit cards, but before doing so, several unauthorized charges were made on his accounts.

Ms. Perillo was likewise victimized several weeks later on December 23, 2003. As with the other victims, she arrived to work early in the morning and placed her personal belongings in a drawer in her work area. At some point during the morning, Ms. Perillo left her work station and upon her return she noticed that the knob to the drawer in

which she had placed her purse was on the floor.

When Ms. Perillo checked her purse, she discovered that her wallet was missing. Credit cards, a medical card, her social security card and driver's license were in her wallet.

During Ms. Perillo's and Mr. McGowan's employment, James Dodd worked for Towers Perrin as head of security. As a result of Ms. Perillo's and Mr. McGowan's reports of stolen items, Mr. Dodd reviewed the security surveillance tapes for the dates in question[,] November 26, 2003 and December 23, 2003, and determined that an unauthorized individual entered the 21st floor of the building, where both Ms. Perillo and Mr. McGowan worked, on the dates in question. The individual was able to gain entry without an access card or visitor's pass by following an authorized vendor on one occasion and an employee on another onto the secured floor. The unauthorized individual was not identified.

In January of 2004, William Jones was a parole agent for the Commonwealth. At that time the Defendant was under his supervision for an Aggravated Assault and Resisting Arrest conviction. 2033 North 20th Street was listed as an approved residence on his Pennsylvania parole paperwork.

The Defendant was originally released from custody in October of 1998 to a community house. He, however, absconded from supervision and was declared delinquent. Officer Jones learned that subsequent to his release from custody in Pennsylvania the Defendant had been convicted in New Jersey of charges involving the fraudulent use of credit cards and was released from that state's custody in the fall of 2003.

The jury was not advised of these previous facts, but learned that on January 9, 2004, Agent Jones was working with Philadelphia law enforcement. On that date, Officer Jones went to 2033 North 20th Street to arrest the Defendant. He was accompanied by his supervisor and a co-worker. At the residence, the officers met Defendant's aunt, Isabel Hall. She allowed the police into the house and directed them to Defendant's room. The Defendant was not present.

The officers began searching the Defendant's room for leads as to his current whereabouts. During the search, the officers discovered men's clothing, mail addressed to the Defendant and three black wallets.

Two of the wallets belonged to Thomas Roden and Kathleen Perillo. In addition, Officer Jones recovered numerous credit cards belonging to Kathleen Perillo, Lisa Barday and Thomas Roden, a state resident identification card with the Defendant's photo and Thomas Roden's name, as well as a credit card application in Thomas Roden's name, a driver's license in Kathleen Perillo's name and the social security cards for Lisa Barday and Thomas Roden. Mr. McGowan's business card, which had been in his wallet, was also found in Defendant's room.

Also recovered that day was a piece of paper with Ms. Barday's personal information[,] social security number, date of birth, address and driver license number, as well as Mr. Roden's business card with similar personal information written on it. The information was not written by either Ms. Barday or Mr. Roden.

The Defendant never worked with any of the complainants, did not have appointments to meet with them on the

dates in question nor was he given permission to take their personal belongings.

Trial Court Opinion (T.C.O.), 11/19/07, at 2–6 (citations to trial transcript omitted).

¶ 3 Appellant was tried before a jury on January 21 and 22, 2005. The jury convicted Appellant on three counts each of burglary and receiving stolen property and four counts of identity theft. The trial court sentenced Appellant on March 5, 2005, as noted above. Appellant filed a timely notice of appeal on March 10, 2005, and he also filed a timely concise statement of matters complained of on appeal. After some apparent delay in the transmission of the record to our Court, Appellant's direct appeal is now before us.

¶ 4 Appellant presents the following sole issue in this appeal:

Did not the lower court err in denying [Appellant's] motion to suppress physical evidence inasmuch as the Commonwealth failed to establish reasonable suspicion to support the warrantless search of [Appellant's] residence by state parole agents in violation of his limited, but still extant, right to be free of unreasonable searches and seizures, under the United States and Pennsylvania Constitutions?

Appellant's brief at 3.

 ¶ 5 The applicable standard of review is as follows:

The standard and scope of review for a challenge to the denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Booze*, 953 A.2d 1263, 1268–69 (Pa.Super.2008) (citations omitted). With this standard in mind, we review the testimony presented at the suppression hearing in this case, in which Appellant sought to suppress the evidence recovered from Appellant's bedroom under both the Fourth Amendment to the United States Constitution and Article 1, section 8 of the Pennsylvania Constitution. N.T. Trial, 1/21/05, at 9.

 ¶ 6 At the hearing, parole agent William Jones testified that he had been assigned to supervise Appellant after a former agent's retirement. *Id.* at 18. Agent Jones explained that Appellant had been paroled originally in Pennsylvania on October 14, 1998, and was placed in a community correction center, but ran away from that facility on December 7, 1998, and was declared delinquent. *Id.* at 20–21. Subsequently, authorities learned that Appellant had been arrested in New Jersey on charges of credit card fraud. *Id.* at 21. Appellant was released from custody in New Jersey, but still failed to report to Pennsylvania parole authorities, *id.* at 23, to whom he owed "back time" for previously absconding from supervision.

¶ 7 Accordingly, Agent Jones, on January 9, 2004, went to Appellant's "approved address" of 2033 North 20th Street in Philadelphia with his supervisor and another agent to arrest Appellant for failing to report during parole and for the new conviction of credit card fraud in New Jersey. *Id.* at 24. When the agents arrived at the address, they were greeted at the door by Appellant's aunt, Isabel Hall. *Id.* at 25. They told her that they were looking for Appellant and she admitted them to the premises. *Id.* at 25–26. Agent Jones tes-

tified that he determined it was Ms. Hall's residence and he knew that Appellant had lived there in the past, but later admitted that he did not know whether Ms. Hall or Appellant owned the premises. *Id.* at 26, 35. Ms. Hall admitted them into the residence and told them that Appellant's bedroom was on the third floor. *Id.* at 25, 35, 37. Agent Jones' supervisor ordered Agent Jones to go up to the third floor to determine whether Appellant was present. *Id.* at 25. Agent Jones and his supervisor went upstairs to the bedroom and determined that Appellant was not present. *Id.* at 27. Agent Jones testified:

> Supervisor Macon ordered a search of the room to make sure we were—to try to get a lead on where [Appellant] might be staying. Supervisor Macon also talked to the aunt and she gave us another address that we tried after that. But during the search to try to find an address, for example, I discovered three wallets underneath the mattress of that bedroom. There was also mail, clothing; mail addressed to [Appellant].

*Id.* at 27. Inside the wallets, Agent Jones found numerous credit cards belonging to Kathleen Perillo, Lisa M. Barday, Devina Maldonado, and Thomas Roden. *Id.* at 27–28. He also found a Pennsylvania identification card under the name of Thomas Roden, but with Appellant's picture on it. *Id.* at 28.

¶ 8 On cross examination by Appellant's counsel, Agent Jones admitted that he had no indication, when he went to 2033 North 20th Street, that he would find contraband, drugs, or guns therein, even though the affidavit of probable cause underlying the arrest warrant for Appellant stated that the agents planned to look for weapons and contraband in addition to leads to Appellant's whereabouts. *Id.* at 34, 40–41. Indeed, Agent Jones admitted that "one of the things [they] always look for" are guns

and drugs, but he emphasized that their primary purpose in searching the room was to obtain leads to Appellant's whereabouts. *Id.* at 34, 36–37. However, Agent Jones admitted that he had "no prior knowledge" or "no specific knowledge, whatsoever, that [Appellant] had any weapons or any contraband or any evidence of criminal activity in that room[.]" *Id.* at 40–41.

¶ 9 Additionally, at the suppression hearing, the Commonwealth presented a form containing the conditions of parole, signed by Appellant prior to his initial release in October of 1998, which contained the following waiver language:

> I expressly consent to the search of my person, property and residence without a warrant by agents of the Pennsylvania Board of Probation and Parole. And items in the Possession of which constitute a violation of parole/reparole shall be subject to seizure and may be used as evidence in the parole revocation process.

*Id.* at 30.

¶ 10 One of the central points of disagreement in this case concerns Appellant's contention that Pennsylvania law requires that a parole agent have reasonable suspicion to search the premises of a parolee, versus the Commonwealth's contention that reasonable suspicion is not required but, rather, a search of a parolee's premises is invalid only if conducted arbitrarily. *See* Commonwealth's brief at 8–9 (citing *Samson v. California,* 547 U.S. 843, 857, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), for proposition that parole search is constitutional if not conducted arbitrarily).

¶ 11 However, the plain language of the following applicable Pennsylvania statute reveals that reasonable suspicion is required to search the property of a state parolee:

**§ 331.27a. Searches by state parole agents**

. . .

(b) State parole agents are authorized to search the person and property of State offenders in accordance with the provisions of this section. Nothing in this section shall be construed to permit searches or seizures in violation of the Constitution of the United States or section 8 of Article I of the Constitution of Pennsylvania.

(c) No violation of this section shall constitute an independent ground for suppression of evidence in any probation/parole or criminal proceedings.

(d)(1) A personal search of an offender may be conducted. . . .

. . .

(2) A property search may be conducted by any agent **if there is reasonable suspicion** to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision.

. . .

(6) The **existence of reasonable suspicion to search shall be determined** in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observation of agents.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of agents with the offender.

(vi) The experience of agents in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

61 P.S. § 331.27a (emphasis added).[1] Our Court discussed the rationale underlying section 331.27a in *Commonwealth v. Curry*, 900 A.2d 390, 394 (Pa.Super.2006) (citations and footnote omitted):

> Because "the very assumption of the institution" of parole is that the parolee is "more likely than the ordinary citizen to violate the law," the agents need not have probable cause to search a parolee or his property; instead, reasonable suspicion is sufficient to authorize a search. Essentially, parolees agree to "endure warrantless searches" based only on reasonable suspicion in exchange for their early release from prison.

*See also Commonwealth v. Edwards*, 874 A.2d 1192, 1197 (Pa.Super.2005) ("The theory behind allowing a parole officer to search a parolee's person upon a showing

---

**1.** The Commonwealth argues that these provisions were adopted prior to *Samson* and, therefore, should not serve to "settle the more general question of the appropriate minimum standard for parole searches." Commonwealth's brief at 14 n. 6. The Commonwealth contends that "the statute does not purport to set out any baseline; instead, while it defines searches based on reasonable suspicion, it does not prohibit searches on less than rea-sonable suspicion." *Id.* We disagree. We read statutes according to their plain language. 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage[.]"). According to the plain language of the statute, emphasized above, reasonable suspicion is a prerequisite for the search of a parolee's property in Pennsylvania.

of reasonable suspicion as opposed to probable cause and to enter his residence without a warrant upon reasonable suspicion rests upon the lower expectation of privacy afforded one released from prison on parole.").

■ ¶ 12 The search of a parolee is only reasonable, even where the parolee has signed a waiver similar to the one in this case, where the totality of the circumstances demonstrate that "(1) the parole officer had reasonable suspicion to believe that the parolee committed a parole violation; and (2) the search was reasonably related to the duty of the parole officer." *Commonwealth v. Hughes*, 575 Pa. 447, 836 A.2d 893, 899 (2003) (plurality) (citing *Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031, 1036 (1997)).

¶ 13 The record, detailed above, supports the trial court's conclusion that the parole agents in this case had reasonable suspicion to believe that the bedroom they searched could contain evidence of another address or place where Appellant (who had absconded from parole supervision and thereafter continuously failed to report for

parole) may be found so that they could effectuate his arrest pursuant to their warrant. *See* T.C.O. at 13. In other words, Agent Jones had (1) reasonable suspicion to believe that Appellant violated his parole, given his history of failure to report (see factors enumerated in 61 P.S. § 331.27a(d)(6) [2]); and, (2) the search was reasonably related to this particular violation as Agent Jones sought to find leads as to where Appellant may be found, as indicated in the affidavit underlying the arrest warrant in this case.

■ ¶ 14 Moreover, Appellant's aunt, who had apparent authority to consent to the search of the residence, allowed the agents to enter the home and directed them to Appellant's bedroom.

A third party with apparent authority over the area to be searched may provide police with consent to search. Third party consent is valid when police reasonably believe a third party has authority to consent. Specifically, the apparent authority exception turns on whether the facts available to police at

2. The dissent contends that the "record on appeal does not contain any basis on which we may properly conclude that the parole officers had any reasonable suspicion to permit them to search Hunter's bedroom" and that Officer Jones "testified that their only purpose in going to the residence was to see if Hunter was there and, if so, to arrest him." Dissent at 555. However, as described above, reasonable suspicion is determined by examining the totality of the circumstances, including the factors enumerated in the statute that is particularly applicable to individuals on parole and which include, *inter alia*, the experience of the agents with the offender, the experience of the agents in similar circumstances, and the parolee's prior supervisory history. 61 P.S. § 331.27a(d)(6). Indeed, because of Appellant's history of absconding from supervision, and contrary to the dissent's characterization of the record, Officer Jones additionally testified that his "primary

purpose" in searching the room was to "ascertain where the defendant could be found[.]" N.T. Trial, 1/21/05, at 34, 36–37. He further testified that the affidavit of probable cause underlying the arrest warrant also indicated that the agents sought, not only contraband, but also leads as to where Appellant could be found—a reasonable request given Appellant's poor history of parole supervision. *Id.* at 40. The trial court, as the factfinder, was entitled to believe this testimony and evidence, and its conclusions are supported by the record. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super.2000) ("[T]he factfinder is free to believe all, part or none of the evidence. . . . Resolving contradictory testimony and questions of credibility are matters for the factfinder."). In this respect, I join in the concurring opinion's recognition that the agents' search of the room was based on more than a mere failure to locate Appellant at his approved address.

the moment would lead a person of reasonable caution to believe the consenting third party had authority over the premises. If the person asserting authority to consent did not have such authority, that mistake is constitutionally excusable if police reasonably believed the consenter had such authority and police acted "on facts leading sensibly to their conclusions of probability."

*Commonwealth v. Strader*, 593 Pa. 421, 931 A.2d 630, 634 (2007) (citations omitted). As described above, Appellant's aunt greeted the agents at the door, the agents determined that it was her residence and that Appellant had lived there before, even though they were not sure whether she owned the premises, and Appellant's aunt admitted them into the residence and directed them to Appellant's room on the third floor. N.T. Trial at 25–26, 35–37. These circumstances were sufficient to confer apparent authority on the aunt for a third-party consent to search the common areas of the residence. *See Hughes*, 836 A.2d at 903 (indicating that "by virtue of living in a residence with other inhabitants, a co-inhabitant assumes the risk that one of the residents may permit the com-

mon area to be searched"). However, the question remains as to whether the aunt had authority to consent to search what is characterized in the record as Appellant's "bedroom."

¶ 15 In this regard, we emphasize that it is Appellant's burden to establish that he has a reasonable expectation of privacy in the area searched. "[A] defendant cannot prevail upon a suppression motion unless he demonstrates that the challenged police conduct violated his own, personal privacy interests." *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680, 692 (2005). "In general, to have a reasonable expectation of privacy, one must intend to exclude others and must exhibit that intent." *Commonwealth v. Lowery*, 305 Pa.Super. 66, 451 A.2d 245, 247 (1982) (noting further that "cases dealing with search and seizure in a family setting emphasize the need for overt indications" of privacy expectation). Simply put, in the instant case, Appellant did not present any evidence at the suppression hearing to establish his intent to exclude his aunt from the particular bedroom searched.[3] *Cf. Commonwealth v. O'Neal,*

**3.** Accordingly, we are not concluding that "Hunter's aunt clearly and unequivocally consented to the search of Hunter's bedroom" as the dissent contends. *See* Dissent at 556. Rather, in congruence with settled law, *see Millner supra*, we are merely recognizing that it is Appellant's burden to establish a subjectively and objectively reasonable expectation of privacy in the bedroom and, because Appellant failed to present any evidence to meet this burden at the suppression hearing, this Court cannot find reversible trial court error. Indeed, although we agree completely with the dissent that a defendant charged with a possessory crime has automatic standing to litigate a suppression motion, nevertheless, to be successful in that motion, the defendant must still also establish that he has (1) a subjective expectation of privacy in the premises searched and (2) that the "expectation is one that society is prepared to recognize as reasonable and legitimate." *Commonwealth*

*v. Bostick*, 958 A.2d 543, 552 (Pa.Super.2008) (citation omitted). Appellant presented no evidence to carry this burden. He did not, for example, establish that he was an owner or lessee of the premises, and, although it appeared he had mail there, he did not present any other evidence to establish, for example, that he intended to exclude others such as his aunt from accessing that room, that he paid rent or helped with the bills, or the extent to which he made use of that room as opposed to some other address (as his aunt alluded to). Thus, given the paucity of evidence presented by Appellant to carry his burden of establishing a reasonable expectation of privacy, we cannot conclude that the suppression court erred or abused its discretion in determining that Appellant failed to meet his burden at the suppression hearing. *Cf. Bostick*, 958 A.2d at 556 (establishing reasonable expectation of privacy where defendant presented evidence

287 Pa.Super. 238, 429 A.2d 1189, 1190–91 (1981) (finding defendant had a legitimate expectation of privacy with regard to a bedroom and closet he was using in the residence of a person who was leasing the entire premises because the doors to the bedroom and closet were closed, the only connection to the bedroom the lessee had was that he owned the dresser and bed therein, the record was silent with regard to whether the lessee had any personal effects in the room, and the lessee had gratuitously relinquished his authority over the bedroom).

¶ 16 In sum, the totality of the circumstances in this case weigh in favor of finding that the parole agents in this case had reasonable suspicion to search the bedroom in an effort to find leads as to where Appellant, who had a protracted history of absconding and failing to report to his parole officer, may be located in order to effectuate his arrest. Since the search was valid under the particular circumstances of this case, it is inconsequential that the agents found, by chance, evidence of other crimes used to prosecute Appellant in the instant case. In other words, the evidence of the theft crimes in this case, were not fruit of the poisonous tree, as Appellant contends. Accordingly, we affirm Appellant's judgment of sentence.

¶ 17 Judgment of sentence affirmed.

¶ 18 Judge FREEDBERG files a concurring opinion in which Judge BENDER joins.

¶ 19 Judge DONOHUE files a dissenting opinion.

Concurring Opinion by FREEDBERG, J.:

¶ 1 I join in all respects with the majority's legal analysis and conclusions. I write

separately because of my belief that the specific facts present in this case make it such that there is no danger that our decision will ever be read to stand for the proposition that, as the thorough dissent suggests, "merely failing to locate a parolee at his/her approved address constitutes reasonable suspicion to conduct a detailed search of those premises...." Specifically, Appellant absconded from supervision and had a history of failure to report. It was reasonable for the parole officers to assume that one who absconds from supervision is not continuing to reside at the address known to the parole authorities. Further, Appellant's aunt, residing at the approved address, expressly provided agents with another address where Appellant might be staying.

¶ 2 In my judgment these facts coalesced to create reasonable suspicion that the searched premises could contain evidence of the whereabouts of an absconding and delinquent parolee so that he could be found and arrested pursuant to a warrant.

¶ 3 Accordingly, I join the Opinion of Judge BENDER.

Dissenting Opinion by DONOHUE, J.:

¶ 1 I agree with the majority's thoughtful analysis of Pennsylvania law applicable to this case. As the majority rightly concludes, 61 P.S. § 331.27a requires that a parole agent have reasonable suspicion to search the property of a parolee. *See, e.g., Commonwealth v. Edwards*, 874 A.2d 1192 (Pa.Super.2005). In my view, the majority is also correct that even when a parolee has signed a consent to search waiver in connection with his/her release, a property search is reasonable when the totality of

that he stayed overnight at premises on weekends, contributed to household bills, received mail with same address, ate meals there, had

free entry to premises, conducted illegal activities on premises, did laundry on the premises).

the circumstances demonstrates that (1) the parole officer had reasonable suspicion to believe that the parolee committed a parole violation, and (2) the search was reasonably related to the duty of the parole officer. *See, e.g., Commonwealth v. Hughes*, 575 Pa. 447, 836 A.2d 893 (2003) (plurality).[4]

¶ 2 I depart from the majority's analysis, however, with respect to its application of these legal principles to the facts of record in this case. The record on appeal does not contain any basis on which we may properly conclude that the parole officers had any reasonable suspicion to permit them to search Hunter's bedroom. The Commonwealth's only witness at the suppression hearing, Officer Jones, testified that before arriving the officers had no indication that there were guns, drugs, or other contraband at the approved residence (2033 North 20th Street). N.T., 1/21/05, at 34. Officer Jones also testified that their only purpose in going to the residence was to see if Hunter was there and, if so, to arrest him. *Id.*

¶ 3 Upon finding that Hunter was not there, Officer Jones admitted that the only reason the officers proceeded to conduct a detailed search of Hunter's bedroom was to find another address where they could look for him. *Id.* at 36. Merely having a hunch that a property search could conceivably turn up relevant evidence, however, does not constitute reasonable suspicion. Instead, at a minimum, the officers needed some basis (i.e., some reasonable suspicion) to believe that Hunter was not living at the residence or was attempting to evade capture. The record in this case does not support any such finding, since all of the information available to the officers indicated that Hunter lived at the residence in the bedroom identified by his aunt.[5] His aunt directed them to "his bedroom" and upon entering they saw his clothing and mail addressed to him inside. *Id.* at 35–37. That the officers did not locate Hunter in his bedroom at 10:30 a.m. on a Tuesday morning, without more, provided no basis for them to conclude that he had either moved out or was attempting to evade capture. After being advised that

4. In my view, this two part test is not applicable in this case, since the parole officers did not go to the approved address to investigate possible parole violations. Instead, the record on appeal clearly demonstrates that the parole officers went to the approved address to serve an arrest warrant on Hunter based upon already established violations of his parole (i.e., his absconding from custody at a community house and his subsequent failures to report). N.T., 1/21/05, at 34, 36–37. Hunter's absence from the approved address at the time of their arrival, without more, did not provide any reasonable suspicion to investigate new or different violations of parole from the ones used to obtain the search warrant.

5. The majority's suggestion in its footnote # 2 that the contents of the affidavit of probable cause underlying the arrest warrant constitutes evidence in support of the trial court's decision is, in my view, not sound. The valid-

ity of the arrest warrant was not at issue here, and thus the contents of the supporting affidavit of probable cause were likewise not relevant to the Commonwealth's case either. When counsel for Hunter introduced the affidavit at the hearing, counsel for the Commonwealth immediately objected on the grounds that it was irrelevant. N.T., 1/21/05, at 39. More importantly, Officer Jones admitted that the contents of the affidavit ("search of the room for weapons, contraband and lead[s] to where Hunter could be found") were not based upon any reasonable suspicion, as he agreed that prior to entering the approved residence he had no knowledge that it would contain any weapon, contraband, or evidence of criminal behavior. *Id.* at 40–41. As the entire record on appeal demonstrates, the officers had no reasonable suspicion, either before or after arriving at the approved residence, to believe that Hunter was not living at the residence or was attempting to evade capture.

the officers were searching for him, Hunter turned himself in. *Id.* at 28.

¶ 4 In my view, the majority here eviscerates the very constitutional and statutory protections it purports to recognize. If merely failing to locate a parolee at his/her approved address constitutes reasonable suspicion to conduct a detailed search of those premises, then parolees have no constitutional or statutory protections against unreasonable searches and seizures at an approved address. If the parolee is not at the approved address when the parole officers arrive, reasonable suspicion "automatically" exists to search the premises for another address. If, on the other hand, the parolee is at the address and is arrested, then a search may be conducted incident to the arrest. *See, e.g., Commonwealth v. Rodriquez*, 532 Pa. 62, 614 A.2d 1378 (1992). Because a property search may be conducted in either case, the requirement of reasonable suspicion, as codified at 61 P.S. § 331.27a, is rendered irrelevant and superfluous.[6] Because I do not believe that was the intent of the legislature, I respectfully dissent.

¶ 5 I likewise do not think that Hunter's aunt clearly and unequivocally consented to the search of Hunter's bedroom. *See, e.g., Commonwealth v. Blasioli*, 454 Pa.Super. 207, 685 A.2d 151, 157 (1996) (the Commonwealth has the burden to prove by clear and convincing evidence that consent was "unequivocal, specific, and voluntary") (quoting *Commonwealth v. Gibson*, 536 Pa. 123, 131, 638 A.2d 203, 207 (Pa.1994)). When the parole officers appeared at her door with an arrest warrant for Hunter, the only reasonable inference is that the aunt allowed them entry into the residence to look for Hunter. Even considering Officer Jones' testimony in the light most favorable to the Commonwealth, it is not reasonable to infer that the aunt understood them to be asking for permission to conduct a detailed search of Hunter's bedroom (including under the mattress on his bed), or that she ever consented to any such search.[7] In fact, Officer Jones testified that the decision to conduct a detailed search was not made until after the officers determined that Hunter was not in the residence, *id.* at 27, and there is no testimony in the record to indicate that the aunt was asked to consent to a detailed search at that time.

¶ 6 In its footnote # 3, the majority indicates that their decision in this regard is based not upon a finding that the aunt consented to the search of Hunter's bedroom, but rather because Hunter failed to establish a reasonable expectation of privacy with regard to his bedroom and his belongings and possessions contained therein. Our Supreme Court has accorded automatic standing to challenge the consti-

---

**6.** Section 331.27a authorizes a property search by a parole agent only where he/she has a reasonable suspicion to believe that the parolee's property contains either (1) contraband, or (2) other evidence of violations of the conditions of parole. 61 P.S. 331.27a(d)(2). In this case, Officer Jones admitted that the agents had no basis to think that they would find contraband at Hunter's approved address. N.T., 1/21/05, at 40–41 ("no prior knowledge" or "no specific knowledge, whatsoever, that [Hunter] had any weapons or any contraband or any evidence of criminal activity in [Hunter's bedroom]."). Moreover, Officer Jones testified that they searched the bed-

room for the purpose of finding evidence of Hunter's whereabouts. *Id.* at 34, 36–37. There is no testimony in the record from anyone suggesting that the search of the bedroom related in any way to an attempt to find evidence of other parole violations.

**7.** Officer Jones did not testify that he looked under the mattress to see if Hunter was hiding there. Instead, he testified that he looked under the mattress to try to find an address. *Id.* at 27 ("But during the search to try to find an address, for example, I discovered three wallets underneath the mattress.").

tutionality of a search under Article 1, Section 8 of the Pennsylvania Constitution, with no preliminary showing of a proprietary or possessory interest by the defendant when possession is an essential element of the Commonwealth's case. *See, e.g., Commonwealth v. Hawkins,* 553 Pa. 76, 80, 718 A.2d 265, 267 (1998). Here Hunter was charged with and convicted of receiving stolen property, an essential element of which is proof that the defendant is in possession of the property. 18 Pa. C.S.A. § 3925(a); *Commonwealth v. Foreman,* 797 A.2d 1005 (Pa.Super.2002).

¶ 7 Moreover, the evidence presented at the suppression hearing demonstrated that Hunter had a subjective expectation of privacy in his own bedroom that society is prepared to recognize as reasonable and legitimate. As our Supreme Court has recognized:

> An individual's *effects and possessions* are constitutionally protected from unreasonable search and seizure as well as his person. U.S. Const. Amend. IV, Pa. Const. art. 1, § 8. This protection does not depend on the physical presence or physical absence of the individual owner. So long as the person seeks to preserve his effects as private, even if they are accessible to ... others, they are constitutionally protected. Put another way, a person must maintain the privacy of his *possessions* in such a fashion that his expectations of freedom from intrusion are recognized as reasonable.

*Commonwealth v. Sell,* 504 Pa. 46, 67, 470 A.2d 457, 468–69 (1983) (emphasis in original). All of the evidence presented at the suppression hearing indicated that the room searched was in fact Hunter's private bedroom.[8] Officer Jones testified that Hunter's aunt directed them to "his bedroom," and upon entering the officers spotted Hunter's clothing and mail addressed to him inside. *Id.* at 35–37. Hunter clearly maintained the items in question (wallets, credit cards, etc.) in a manner that indicated a subjective personal privacy interest in them—he put them under the mattress in his bedroom, rather than leaving them out for others to see. In addition, in my view a subjective expectation of privacy in one's own bedroom is one that society is prepared to recognize as both reasonable and legitimate. *Cf. Commonwealth v. Roland,* 535 Pa. 595, 599, 637 A.2d 269, 270 (1994) ("In a private home, 'searches and seizures without a warrant are presumptively unreasonable'") (quoting *Arizona v. Hicks,* 480 U.S. 321, 327, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)).

¶ 8 For these reasons, I would reverse the trial court's decision to deny Hunter's motion to suppress.

---

**8.** I disagree with the majority's reliance on *Commonwealth v. Millner,* 585 Pa. 237, 888 A.2d 680 (2005). Unlike in this case, which involves a search of a person's private bedroom, *Millner* involved a seizure of evidence from a vehicle after police officers heard gunshots, observed the suspect and a companion in the vehicle with a gun from a public street, found drugs on the defendant, and arrested him. Based upon these facts, our Supreme Court concluded that the suspect did not have a reasonable expectation of privacy in the vehicle. *Id.* at 257–58, 888 A.2d at 692.