J-A17013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DANIEL KHALIL CLARY :
:
Appellant : No. 463 EDA 2019

Appeal from the Judgment of Sentence Entered August 31, 2018
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0003961-2017

BEFORE: BOWES, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.: **FILED DECEMBER 15, 2020**

Daniel Khalil Clary appeals from the judgment of sentence of fifty-three and one half to one hundred and seven years of imprisonment imposed after he was convicted of two counts of aggravated assault of a law enforcement officer and related offenses. After careful review, we affirm.

On November 7, 2017, Appellant was driving his vehicle on State Route 33 in Northampton County, Pennsylvania when Pennsylvania State Trooper ("PSP") Ryan Seiple observed Appellant exceeding the posted speed limit and initiated a traffic stop. *See* N.T. Jury Trial, 6/25/18, at 14-22. The full interaction between Appellant and Trooper Seiple was captured on the mobile video recorder ("MVR") on Trooper Seiple's vehicle. *See* N.T. Jury Trial, 6/24/18, at 71-72; N.T. Jury Trial, 6/25/18, at 27-28, 89, 90-101; *see also* Commonwealth Exhibit C-7. After issuing a citation to Appellant for speeding and answering Appellant's questions regarding the citation, Trooper Seiple

returned to his vehicle, initiated his turn signal, and began to maneuver back onto Route 33. N.T. Jury Trial, 6/25/18, at 37-38. However, upon observing Appellant waving for him to return, Trooper Seiple returned his vehicle to its original position and re-approached Appellant's vehicle. *Id*. at 38.

Appellant asked Trooper Seiple additional questions about the traffic citation. Trooper Seiple repeated the reasons for the traffic citation and again directed Appellant to read and follow the directions on the ticket. After observing an air freshener in the vehicle called "blunt effects" and that Appellant had a green tongue, Trooper Seiple became concerned that Appellant's confusion regarding the simple directions on the citation could be due to marijuana intoxication. *Id*. at 39-45. Trooper Seiple returned to his vehicle and requested back-up to assist him with conducting field sobriety testing. *Id*. at 46.

Once Trooper Seiple's supervisor, Corporal Seth Kelly, arrived at the scene, Trooper Seiple asked Appellant to exit the vehicle. Appellant complied with the directive and a frisk did not uncover any weapons. *Id*. at 47-48. Trooper Seiple administered field sobriety tests, all of which Appellant failed. *Id*. at 49-52. Accordingly, Trooper Seiple concluded that Appellant was under the influence of marijuana and incapable of safe driving, and instructed him to place his hands behind his back. *Id*. at 52. Before Trooper Seiple could retrieve his handcuffs from his waist, Appellant turned his body and began actively resisting arrest. *Id*. at 53. A struggle ensued, wherein Appellant reached for Corporal Kelly's gun and managed to disarm Trooper Seiple by

ejecting the magazine from his service weapon, so that Trooper Seiple only had access to the bullet in the chamber of his weapon.

Corporal Kelly and Trooper Seiple deployed their tasers, hitting him multiple times. *Id*. at 54-58. Thereafter, they attempted to subdue Appellant with their fists, but Appellant continued struggling and broke free from the officers. *Id*. at 61-62. With Corporal Kelly and Trooper Seiple in close pursuit, Appellant ran to the driver side of his vehicle, reached in the window, and pulled out a loaded firearm. *Id*. Appellant shot at both officers, critically wounding Corporal Kelly, who had not yet retrieved his weapon from its holster. Trooper Seiple fired the one shot in his chamber and retreated to reload. *Id*. at 63-65. When Appellant exhausted his ammunition, he threw his firearm in the vehicle, and reentered the driver's seat. *Id*. Corporal Kelly crawled over the guard rail and began firing into the front passenger seat window. *Id*. at 66-67. Trooper Seiple fired into the back window. Appellant was hit in the head, chest, and hand, but still managed to flee from the scene in his vehicle.

Appellant stopped at Easton Hospital to seek medical treatment for his gunshot wounds. Later that day, he was transferred to Lehigh Valley Cedar Crest Hospital, which was better equipped to handle his injuries. During transport, Appellant blurted out: "They fucking tased me. I got back up, ran to my car, grabbed my gun, and let two off at his ass. I think I killed his ass." N.T. Jury Trial, 6/26/18, at 59-60. Appellant remained at Cedar Crest Hospital

for five days. Not long after his arrival, Appellant waived his **Miranda** rights[1] and agreed to speak with law enforcement officers. During the interrogation, Appellant admitted to shooting at the troopers and trying to hit them with his firearm. **See** N.T. Jury Trial, 6/25/18, at 195, 206; N.T. Jury Trial, 6/26/18, at 10, 49, 95-96, 109-15, 123.

Trooper Seiple and Corporal Kelly remained on scene after Appellant absconded. On the MVR, Trooper Seiple can be heard calling for help and requesting an additional tourniquet. **See** N.T. Jury Trial, 6/24/18, at 58-60. Corporal Kelly sustained a gunshot wound to his femoral artery, shoulder, and neck, but was able to apply a tourniquet to his own leg before losing consciousness. **Id**. at 60-62. Emergency medical personnel arrived on site and performed CPR. After Corporal Kelly regained consciousness, he was transported by medical helicopter to St. Luke's Hospital in Bethlehem, Pennsylvania. Corporal Kelly underwent three simultaneous surgeries, after which he was placed in a medically-induced-coma for twelve days, attached to a ventilator, and underwent dialysis. Three weeks later, Corporal Kelly was released from the hospital with no memories of the events of November 7, 2017.

As a result of the shooting, Appellant was arrested and charged with criminal attempt to commit homicide of both troopers and other related charges. Appellant filed two pre-trial motions seeking to suppress statements

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

that he made in the hospital, precluding expert testimony, seeking pre-trial discovery, requesting a pre-trial conference, and urging dismissal of the two DUI charges.

On May 22, 2018, the trial court held a hearing on Appellant's pre-trial motions. At the hearing, the Commonwealth presented four witnesses, who testified to the circumstances surrounding Appellant's various inculpatory statements. At the conclusion of the hearing, the court took the matter under advisement and directed the parties to file post-hearing briefs. After consideration of the briefs, the court issued an order and opinion denying Appellant's suppression motion.

On June 24, 2018, Appellant proceeded to a jury trial. Appellant did not testify or present a defense. However, during closing argument, trial counsel pursued a justification defense, arguing that Appellant, a young African-American male, was confused and afraid for his life because of the actions of the troopers. On June 29, 2018, the jury convicted Appellant of two counts each of attempted murder of a law enforcement officer, aggravated assault of a law enforcement officer, disarming a law enforcement officer without lawful authorization, and one count each of escape, carrying a firearm without a license, and resisting arrest. The jury acquitted Appellant of the remaining DUI charge. On the same day, the trial court convicted Appellant of exceeding the posted speed limit. Sentencing was deferred so that a pre-sentence investigation ("PSI") and psychiatric evaluation could be completed.

On August 31, 2018, Appellant was sentenced to an aggregate sentence of fifty-three and one-half to one hundred and seven years of incarceration. More specifically, Appellant received two consecutive periods of incarceration of twenty to forty years at the assault of a law enforcement officer charges, two consecutive terms of incarceration of three and a half to seven years for the disarming law enforcement officer convictions, a consecutive period of two to four years of incarceration for the escape offense, a consecutive term of one to two years of incarceration for resisting arrest, and a consecutive period of three and half to seven years of incarceration for carrying a firearm without a license. The attempted murder convictions merged with the aggravated assault charges for the purpose of sentencing.

Appellant filed a timely post-sentence motion challenging the jury charge and requesting reconsideration of his sentence. With regard to the latter, Appellant alleged that the sentencing court failed to consider mitigating factors and that the record did not support a sentence in the aggravated range. The trial court denied Appellant's post-sentence motion and this appeal followed. Both Appellant and the trial court have complied with the mandates of Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

a. The trial court refused to suppress custodial statements made by the Appellant while he was handcuffed in a trauma center hours after suffering multiple gunshot wounds to his head, chest, and hand. Was this reversible error?

b.      During the jury charge, did the trial court usurp the jury's role as trier of fact and commit reversible error by substituting its own biased opinion for the trial testimony and evidence in the case?

c.      Should the Appellant's sentence be vacated where (a) the trial court conflated his mental illness with his competency to stand trial and thereby failed to conduct a proper mitigation analysis and (b) the trial court failed to state on the record the reasons for its imposition of the statutory maximum sentence on all charges except one?

Appellant's brief at 6.

First, Appellant alleges that the trial court erred when it refused to suppress the statement he made to police. *See* Appellant's brief at 31. Our standard of review when considering a challenge to the denial of a suppression motion is:

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Arter*, 151 A.3d 149, 153 (Pa. 2016) (citation omitted). Importantly, "it is the sole province of the suppression court to weigh the credibility of witnesses," and "the suppression court judge 'is entitled to believe all, part or none of the evidence presented.'" *Commonwealth v. Fitzpatrick*, 181 A.3d 368, 373 (Pa.Super. 2018) (citing *Commonwealth v. Biasioli*, 685 A.2d 151, 157 (Pa. 1996)).

Appellant asserts that his statement should have been suppressed as it was involuntary. *See* Appellant's brief at 31-37. "It is well-established that when a defendant alleges that his confession was involuntary, the inquiry becomes not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Commonwealth v. Yandamuri*, 159 A.3d 503, 525 (Pa. 2017) (internal citations omitted). Voluntariness is determined by a review of the totality of the circumstances. *See Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998). In assessing the totality of the circumstances, the suppression court should consider: "the duration and means of the interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and all other factors that could drain a person's ability to resist suggestion and coercion." *Yandamuri*, *supra* at 525.

At the suppression hearing, PSP Corporal Arthur Johnson testified about Appellant's interrogation, which he conducted alongside PSP Corporal Chris Yaworski at Lehigh Valley Hospital.[2] *See* N.T. Suppression Hearing, 5/22/18,

---

[2] The Commonwealth called three other witnesses who testified to other statements obtained from Appellant. Specifically, PSP Corporal Michael Irons overheard Appellant say that "he drove himself to the hospital" while speaking to medical personnel; Lehigh County Sergeant James Grell was standing guard in Lehigh Valley Emergency Room, when Appellant looked at him and uttered,

at 44-98. Before approaching Appellant, Corporal Johnson sought and received permission from Appellant's attending physician to speak with Appellant. *Id*. at 50-51, 78. Corporal Johnson observed that Appellant was conscious and alert. *Id*. at 53-54. After Corporal Johnson read Appellant his *Miranda* rights, Appellant read the form to himself and signed the waiver. *Id*. at 56-60. The ensuing interrogation lasted approximately twenty-five minutes, during which Appellant told the officers the story of his entire day. *Id*. at 61-62. Other than the occasional follow-up question, Appellant spoke in uninterrupted narrative form. When Appellant began displaying signs of discomfort, Corporal Johnson immediately terminated the interview. *Id*. at 72-73.

Appellant alleges that the waiver was involuntary because he "exhibited obvious signs of discomfort and pain" and had a low average IQ. *See* Appellant's brief at 34. The trial court disagreed and explained its reasoning for denying the motion to suppress, as follows:

> With regard to the Motion to Suppress [Appellant's] statements, the only testimony submitted at the suppression hearing was by the Commonwealth witnesses. At no point were the witnesses impeached or contradicted. There was nothing about the evidentiary presentation that gives us pause. We find the

_____

"you never think about that one second that changes your whole life, I should have kept driving;" and PSP Trooper Peter Delgaizo overheard Appellant telling Easton Hospital Emergency Room personnel that "The State Police shot me." N.T. Suppression Hearing, 5/22/18, at 12, 22, 32. However, since trial counsel withdrew her suppression motion regarding these three statements, we do not address them here. *Id*. at 103.

Commonwealth evidence presented at the suppression hearing to be credible.

. . . .

Here, we note that the [s]tate [p]olice questioned [Appellant] who appeared to be alert and cooperative. They read the *Miranda* statement to [Appellant], then gave the written statement to [Appellant], and permitted him to review it on his own after which [Appellant] signed the waiver and indicated that he was willing to speak to the police.

Thereafter, the [s]tate [p]olice [t]roopers merely asked [Appellant] to provide a narrative of his whole day, including the incident in question. [Appellant] voluntarily did so. Periodically, the [t]roopers interrupted [Appellant] to ask for clarification and/or follow up questions.

Apparently, [Appellant] wishes us to infer that because he was injured and receiving medical attention at the time that he waived his *Miranda* rights and agreed to submit to questioning that his medical condition, by itself, rendered him incapable of waiving his *Miranda* rights. However, the testimony [of] record supports that [Appellant's] waiver of his *Miranda* rights was knowing and intelligent. Further, based on the record presented at the Suppression Hearing, at no point did [Appellant's] physical or psychological state, the conditions attendant to the detention, or the attitude exhibited by the [t]roopers during the interrogation, [support] that there was any attempt to drain [Appellant's] ability to resist suggestion and/or coercion or that any aspect of [Appellant's] statement was involuntarily obtained.

Trial Court Statement of Reasons, 6/11/18, at 9-10. The trial court's conclusions are supported by the record.

Corporal Johnson testified that Appellant received his *Miranda* warnings, appeared to understand them, and expressly agreed to speak with them. Despite being told that he could take a break at any time, Appellant never requested one. *See* N.T. Suppression Hearing, 5/22/18, at 62. Instead,

Appellant was alert, cooperative, and responsive to the troopers' questions. When Appellant showed signs of discomfort, the interview was immediately terminated. *Id*. at 72-73. No further testimony was provided by either side on this issue.

The trial court explicitly credited Corporal Johnson's testimony, which did not support Appellant's claim that he "exhibited obvious signs of discomfort and pain during questioning" or that he had a low IQ. *See* Trial Court Statement of Reasons, 6/11/18, at 9; *see also* Appellant's brief at 34. We may not, as Appellant's argument would require, disregard the trial court's credibility findings where they are supported by the record, or infer alternate findings based on facts not adduced at the suppression hearing. *See Commonwealth v. Fulton*, 179 A.3d 475, 487 (Pa. 2018) (When reviewing a ruling on a motion to suppress, our scope of review is limited to the record developed at the suppression hearing). Accordingly, we find that the trial court did not err when it denied Appellant's suppression motion.

Next, Appellant contends that the trial court abused its discretion by providing improper commentary throughout its justification jury instruction, which undermined Appellant's justification defense. *See* Appellant's brief at 37. We review the trial court's jury instruction as follows:

> [T]he reviewing court must consider the charge as a whole to determine if the charge was inadequate, erroneous, or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. A new trial is required on account of an erroneous

- 11 -

jury instruction only if the instruction under review contained fundamental error, misled, or confused the jury.

***Commonwealth v. Fletcher***, 986 A.2d 759, 762 (Pa. 2009) (citations and quotations omitted).

"It is properly the function of the trial judge to define and frame for the jury those factual issues which are contested and which require the weighing of conflicting evidence. In order to achieve this, it is frequently advisable to suggest less significance regarding issues where the evidence is not in dispute." ***Commonwealth v. Kelly***, 446 A.2d 941, 942 (Pa.Super. 1982). Such instructions may be delivered at any time, "provided[:] (1) there is reasonable ground for any statement [the trial court] may make; and (2) [the trial court] clearly leaves to the jury the right to decide all the facts and every question involved in the case regardless of any opinion of the court thereon." ***Commonwealth v. Nesbitt***, 419 A.2d 64, 67 (Pa.Super. 1980).

Appellant elected not to testify at trial about what he believed the situation to be when he deployed deadly force. Instead, the claim of self-defense arose from the Commonwealth's evidence as construed by trial counsel in her closing argument, which focused on the one minute and six seconds after Appellant was told to place his hands behind his back, wherein Appellant attempted to pull away and was repeatedly tasered:

> . . . . Look at those photographs. He is writhing in pain on the ground through much of this encounter. He does not throw a punch. He does not slap anyone. He doesn't kick anyone. He is incapacitated. 50,000 volts that somehow dissipates down to 1,200, 1,800, whatever number it was that Corporal Selverian told

you.  But it wasn't given to him once.  It was given to him over and over and over again.  You have the taser reports.  It shows you how many seconds he is being tasered in this incident, and you can see it on the video.

He is turned upside down.  He is falling into the highway, hitting his head on the pavement.  Being tasered by two tasers while he's in an open driving lane of Route 33.

When you hear the Judge's instructions, you're going to be asked whether the Commonwealth has proven beyond a reasonable doubt that [Appellant] was not in fear for his life.  That he was not in fear of being seriously injured.

. . . .

[Appellant] has no idea what's going on in that one minute and six seconds.  He says, for what?  He doesn't get an answer.  No one says you're under arrest.  Nobody ever says you're under arrest.  Trooper Seiple doesn't have handcuffs in his hands.  They both come at him.  He doesn't know whether he is going to be beaten up or die.

And I expect that [the prosecutor] is going to tell you that it's ridiculous for him to think that.  Is it ridiculous in this day and age to think that a [twenty-two] year-old man with no experience with the law, having this happen to him where no one even tells him he's under arrest or pulls out their handcuffs, that he doesn't know what's happening to him.  You bet he's scared.  You bet he's scared for his life.

. . . .

He was not attempting to murder a law enforcement officer.  He was not trying to aggravatedly assault a law enforcement officer.  He was trying to stay alive.

N.T. Jury Trial, 6/29/18, at 12-16.  Accordingly to trial counsel's closing argument, the one minute and six seconds after Appellant was told to put his hands behind his back were where the jury should focus its attention.  Since Trooper Seiple never explicitly told Appellant that he was under arrest, or

- 13 -

responded to Appellant's question: "for what?", Appellant did not know what was going on when Trooper Seiple told him to turn around and put his hands behind his back. *Id*. As a young black male, who considered himself outnumbered and outgunned by the two troopers, Appellant contends that he reasonably feared for his life and responded accordingly. *Id*. Trial counsel went on to explain how Appellant's actions after the shooting were consistent with someone who felt that his actions were necessary to save his life, *i.e.*, that he drove straight to a hospital, made no attempt to conceal the firearm, told hospital staff that he had been shot by the police, and that he had shot at the police. *Id*. at 15-16.

The trial court issued the following jury charge regarding the justification defense counsel put forth in her closing argument:

> Now, I need to speak to you about another rather complex criminal definition. And that has to do with Pennsylvania's definition of self-defense, which is also referred to as justification. And before I give you the instruction, let me briefly note for you, for the most part, it is the Commonwealth's burden of disproving potential defenses. However, there are some defenses under the law that a [d]efendant might be required to prove himself or herself, like insanity and entrapment.
>
> People who say the government entrapped me. You, as a defendant, have to prove that yourself by your own evidence. Or if you say, I am crazy and I cannot be held responsible for my actions. You are going to have to call witnesses; professional witnesses, like psychiatrists to come in and say, this guy is crazy. We cannot hold him responsible. That's the defendant's burden to introduce that kind of evidence.
>
> However, self-defense does not require the [d]efendant's proof establishing self-defense. The way our law is designed, the Commonwealth must demonstrate, from the record, that any

reasonable person, reviewing the record, would conclude that justification is not available, or self-defense is not available, to this defendant. So, rather than proving something, this is a defense that the Commonwealth has to disprove. Meaning it is not a reasonable defense to consider.

So, here the self-defense argument is arisen because the attorney puts it in play and/or maybe from a statement by the [d]efendant somewhere that said he was fearful of his life.

So, let me give you the definition now. The [d]efendant has raised the issue of whether he acted in self-defense when he shot at the police. Self-defense is called justification in the law of Pennsylvania. If the [d]efendant's actions were justified, you cannot find him guilty beyond a reasonable doubt. The issue having been raised, it becomes the Commonwealth's burden to prove beyond a reasonable doubt that the [d]efendant did not act in justifiable self-defense.

Now, there are special charges related to this case because deadly force was used. So, the first matter that you must consider in deciding whether the Commonwealth has met its burden in this regard is what kind of force the [d]efendant used in this instance. There are two kinds, obviously, deadly and non-deadly. The Commonwealth claims here that deadly force was used by the [d]efendant, and it must prove that claim beyond a reasonable doubt.

Well, I think that it is without contention now, that when you start firing guns around deadly force was being used in this incident. But I will define deadly force anyway because I am required to. Deadly force is force that under the circumstances in which it is used, is readily capable of causing death or serious bodily injury. Serious bodily injury is bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

According to this definition, force is not deadly force simply because it happens to kill or seriously injur[e]. For example, a slap in the face that freakishly and unexpectedly leads to death is not ordinarily deadly force. A defendant uses deadly force when he or she knows that his or her actions, under the circumstances

in which he or she commits them, are readily capable of causing death or serious bodily injury.

Now, with regard to the rules with regard to deadly force. Because by matter, I am saying by operation of law, you should find that the Commonwealth proves to you beyond a reasonable doubt, that the [d]efendant used deadly force. Then to prove that such force is not justifiable in this case, the Commonwealth must prove one of the following elements beyond a reasonable doubt.

First element that the Commonwealth may prove. And these are in the alternative. That the [d]efendant did not reasonably believe that he was in immediate danger of death or serious bodily injury from law enforcement at the time he used the force, and that, therefore, his belief that it was necessary for him to use deadly force to protect himself was unreasonable. Put another way, the Commonwealth must prove either; one, that the [d]efendant did not actually believe he was in danger of death or serious bodily injury such that he needed to use deadly force to defend himself; or that while the [d]efendant actually believed he needed to use deadly force, his belief was unreasonable in light of all the circumstances known to him.

Keep in mind, a person is justified in using deadly force against another, not only when they are in actual danger or unlawful attack, but also when they mistakenly but reasonably believe that they are. A person is entitled to estimate the necessity for the force he or she employs under the circumstances as he or she reasonably believes them to be at the time.

In the heat of a conflict, a person who has been attacked ordinarily has neither the time nor the composure to evaluate carefully the danger and to make judgments about exactly how much force is needed to protect himself.

Consider the realities of the situation faced by the [d]efendant here when you assess whether or not the Commonwealth has proven beyond a reasonable doubt either that he did not believe he was actually in danger of death or serious bodily injury to the extent that he needed to use such force; or that while he did believe that, his belief was not reasonable.

So, the measuring stick is always the reasonable man measuring stick. Not subjectively what you believe he was thinking at the

time. You take a look overall at everything, and you make your decision if you believe the decisions made were reasonable.

Now, the second one is that the [d]efendant knew. When I say second one, let me move back. Again, like I said before, there were two things. First, that the [d]efendant did not believe he needed to use deadly force to protect himself or if he did believe that he needed to use deadly force, that his belief was unreasonable. It means it made no sense that he would want to use deadly force. Do you understand? To protect himself. That is the first one.

Now, the second one that the Commonwealth can prove instead is this one. And as I said, they are in the alternative. The Commonwealth only has to prove one to disprove self-defense.

The second one is this. That the [d]efendant knew that he could avoid the necessity of using deadly force with complete safety. And there are two elements. One is by retreating. When I say retreating, it means that the [d]efendant has an obligation to retreat, but he failed to do so.

However, there are exceptions to having to retreat. First of all, if you are in your own home, by law, you are not obligated to retreat from your own dwelling. That is one time. But that is not in play here.

Secondly, a defendant is not obligated to retreat from his place of work. So, if you are at work and someone attacks you, you can stand your ground so to speak. Also, the defendant cannot use deadly force if he can avoid the necessity of using deadly force if he complies with a demand that he abstained from taking any action he had no duty to take, and he failed to do so.

Now, this is a little complex, but it is going to come to focus shortly. With regard to the use of deadly force under arrest, the Commonwealth needs to prove only this to satisfy you beyond a reasonable doubt that the [d]efendant was not justified to use deadly force. If the [d]efendant used force to resist an arrest when the [d]efendant knows that the arrest is being made by a police officer whether or not the arrest is lawful.

However, a defendant does not forfeit his right to claim that his actions were justified if he or she reasonably believes that he was

- 17 -

protecting himself against unlawful and deadly force by the officer. To prove this element then, the Commonwealth must prove beyond a reasonable doubt that the [d]efendant did not believe that the arresting officer was using unlawful and deadly force against him. Or if the [d]efendant did believe that, that his belief was not reasonable. It is a really complex decision by you because there are several aspects to this. And it is going to be up to you to figure out and sort through this.

Obviously, at the beginning of this whole issue, when the [d]efendant was asked to put his arms behind his back, clearly no reasonable person would believe that. Obviously, at the time when this whole incident arose, when the [d]efendant was asked to put his arms behind his back there was no threat. No reasonable person would believe they were under a threat of deadly force. He was being arrested for DUI. There were no weapons displayed, no aggressive action taken. He had no lawful authority to resist the arrest as I explained it before. But he did. He did not want to submit.

The police officers tried to detain him, and it progressively increased from there. He had no right to engage in the fight that he did with the police simply because he decided on his own that he did not want to be arrested. Frankly, if he believed that the arrest was unlawful he is wrong because it was not unlawful, the police had the authority because they had –probable cause to believe based on what they saw that he may have been under the influence. An unlawful arrest is if they tried to use illegal force or violated his constitutional rights, then that DUI arrest was an unlawful arrest. But he can never say that the acts of the police, when they attempted to arrest him for the DUI was unlawful.

By operation of law, it is not. No reasonable person can believe that it was unlawful what they were doing. If they are wrong and he proves himself innocent at trial, that just means they made a mistake. It does not mean that the arrest was unlawful.

So, when they attempted to detain him for the DUI, it was a lawful arrest. And then he resisted and they began using various, I guess, items of force in their tool bag with regards to trying to control him. I guess, the argument is that at some point the police began acting wholly irrationally, unlawfully, and that any reasonable person should believe that they should have backed off and let him alone because the continued use of force was

threatening to his life. Even though he was resisting it was still threatening his life, and he had a right . . . at some point to defend his life. That is the argument and that is for you to decide.

At any point in time, did the police activity become so unreasonable that they were, on their own, putting his life in danger because they were attempting to detain him? Such that it was reasonable for him to run around his car, access his weapon and begin a confrontation by introducing a deadly weapon to the arrest. That is what his argument is, and you have to make a determination, is that reasonable? Is that a decision that people can make when the police attempt to arrest them for a DUI, and there is a struggle because the person is not happy about it?

And that happens in everyday life that you get people that do not want to submit to arrest because they are not happy. Does that mean that the entire event, as it escalates, at some point that the person could say, okay. They have to stop trying to detain me because now I believe I am in danger of death. And because they continue to try to control me, I can break free and get a gun and defend myself. That is what the argument is, but that's only for you to decide.

N.T. Jury Trial, 6/29/18, at 98-108. At the conclusion of the instructions, trial counsel objected to the charge and moved for a mistrial, which was denied. *Id*. at 111-12, 115-18.

According to Appellant's self-defense argument, it was necessary to utilize a deadly weapon because he reasonably feared for his life from the police. Appellant argues that the trial court defeated his defense when it erroneously injected its own findings of fact and opinion into the justification instruction by stating that: (1) no reasonable person would have believed he was under threat of deadly force prior to the attempt to arrest Appellant; (2) Appellant had no right to resist a lawful arrest; and (3) it was unreasonable

for Appellant to believe that he needed to respond with deadly force to a routine DUI arrest. ***See*** Appellant's brief at 37-43.

The Commonwealth counters that the trial court's statements were an accurate summation of the law, consistent with the facts adduced at trial, and responsive to Appellant's closing argument. ***See*** Commonwealth's brief at 26. Its evidence revealed that, until Appellant was instructed to put his arms behind his back, there was no violence or resistance displayed by any party. ***Id***. Further, trial counsel did not dispute this point in her closing argument. ***Id***. Therefore, statements regarding the events that proceeded the struggle were accurate summations of the facts. Additionally, the trial court's statements on the law tracked relevant precedent in this area, as well as trial counsel's closing argument. ***Id***. at 28. We agree with the Commonwealth and address Appellant's arguments individually, below.

First, Appellant takes issue with the trial court's statement that the Commonwealth had proven that Appellant utilized deadly force and that no reasonable person would have believed he was under the threat of deadly force prior to the attempt to arrest Appellant. However, this statement was entirely consistent with the undisputed facts presented at trial.

At trial, the Commonwealth alleged and the MVR portrayed that no firearms or threats of force were introduced into the incident until after the arrest of Appellant failed. Later in the encounter, the video depicted Appellant shooting his firearm at the troopers, critically wounding Corporal Kelly. At the

hospital, Appellant admitted to firing his weapon at the officers, even conceding that he may have killed one of them. Appellant never recanted these statements. While trial counsel alleged that the situation transformed into one where Appellant's response was justified, she never argued that Appellant did not deploy his firearm or that his actions would have been justified earlier in the encounter. The Commonwealth strongly contradicted the defense theory that the situation devolved into one where Appellant's response was justified. Instead, it contended that Appellant provoked this encounter. *Id*. at 32. Therefore, the trial court's comments properly steered the jury towards this factual dispute.

Second, Appellant asserts that the trial court's declaration that Appellant had no right to resist a lawful arrest was improper. Again, we are constrained to disagree, as legal precedent in this area is definitively opposed to Appellant's argument. In the context of resisting arrest with respect to the defense of justification, our Supreme Court has explained that arrestees do not have the right to resist a lawful arrest unless or until officers put the arrestee in fear of his own life, as follows:

> [A]n arrestee's use of force in self[-]protection is justified when the arrestee reasonably believes that such force is immediately necessary to protect against an arresting officer's use of unlawful and deadly force, *i.e.*, force which is readily capable of causing death or serious bodily injury. An arresting officer's use of excessive force capable of causing less than serious bodily injury or death can be vindicated by recourse to subsequent legal remedies.

> Thus, . . . there is no justification for resisting arrest; the only circumstance under which the law will contemplate physical resistance to a police officer is when the officer unnecessarily uses unlawfully excessive or deadly force which triggers the right of self-defense. The focus ... [is] not whether the underlying arrest was based on probable cause, but rather whether the officers' use of force in effectuating a lawful arrest [is] itself, unlawful. A police officer may only use the amount of force which is necessary to accomplish the arrest.

*Commonwealth v. Biagini*, 655 A.2d 492, 499 (Pa. 1995) (quoting *Commonwealth v. French*, 611 A.2d 175, 179 (Pa. 1992)); *see also* 18 Pa.C.S. § 505(b)(1)(i) (The use of force is not justifiable "to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful"). Since it is well-settled that arrestees do not have the right to resist either a lawful or unlawful arrest, the trial court's instruction was an accurate summary of the legal precedent in this area. *Id*.

This instruction aligned with the undisputed facts of the case. A careful reading of trial counsel's closing argument reveals that this instruction was consistent with Appellant's self-defense argument, because it was premised upon the undisputed fact that a routine and lawful DUI arrest transformed into a highly charged and potentially lethal encounter after the botched arrest attempt put Appellant in fear for his life. Specifically, trial counsel argued that Appellant's use of deadly force became justified once the troopers deployed their tasers and repeatedly punched Appellant in the face and body, which occurred **after** Appellant began resisting their lawful DUI arrest. *See* N.T. Jury Trial, 6/29/18, at 12-16. Again, it was not until after the officers told

Appellant to place his arms behind his back that the defense and Commonwealth theories of the case diverged.

Finally, Appellant contends that the trial court opined that it was unreasonable for Appellant to respond to a routine DUI arrest with force, when it said the following:

> At any point in time, did the police activity become so unreasonable that they were, on their own, putting his life in danger because they were attempting to detain him? Such that it was reasonable for him to run around his car, access his weapon and begin a confrontation by introducing a deadly weapon to the arrest. That is what his argument is, and you have to make a determination, is that reasonable? Is that a decision that people can make when the police attempt to arrest them for DUI, and there is a struggle because the person is not happy about it?
>
> And that happens in everyday life because you get people that do not want to submit to arrest because they are not happy. Does that mean the entire event, as it escalates, at some point that the person could say, okay. They have to stop trying to detain me now because now I believe I am in danger of death. And because they continue to try to control me, I can break free and get a gun and defend myself. That is what the argument is, but that's only for you to decide.

N.T. Jury Trial, 6/29/18, at 107-108. A review of the definition of legal reasonableness reveals that Appellant has mischaracterized the trial court's instruction in order to support his argument.

Importantly, reasonableness in the context of the justification defense, is defined as follows:

> The requirement of reasonable belief encompasses two aspects one subjective and one objective. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to

- 23 -

> defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

*Commonwealth v. Mouzon*, 53 A.3d 738, 752 (Pa. 2012). Stated differently, an arrestee that was subject to a lawful arrest does not forfeit his right to subsequently claim a justification defense if he can establish a subjective and objective reasonable belief that deadly force was a necessary response to unlawful police action. *Id*. In this section of the jury charge, the trial court was attempting to explain the dichotomy between a subjectively-held reasonable belief and an objectively-held reasonable one. In order to illustrate a challenging legal concept, the court parsed out trial counsel's closing argument and summarized it in light of the definition of reasonableness. Rather than prejudice Appellant, the trial court's instruction gave Appellant's justification defense full credit. Accordingly, Appellant's final contention of error fails.

When viewed as a whole, we find that the trial court adequately presented the concepts of the justification defense to the jury. *See Commonwealth v. Ragan*, 743 A.2d 390, 397 (Pa. 1999). While the instruction at times may not have been a model of clarity, we do not find that reversible error occurred. To the extent that the court made definitive pronouncements regarding deadly force, the lawfulness of the attempted arrest, the right to resist a lawful arrest, and the reasonableness of the use of force, it did so consistently with the facts and arguments adduced at trial. The

method chosen illustrated a difficult legal concept for the jurors, which had been rendered more challenging to access due to the sole assertion of self-defense in the closing argument. Since nothing in its instruction was "inadequate, erroneous, or prejudicial," we find that the trial court did not abuse its discretion. *See Fletcher*, *supra* at 792. Accordingly, no relief is due.

In his final claim, Appellant challenges the discretionary aspects of his sentence. *See* Appellant's brief at 46. Specifically, Appellant attacks his sentence on two related grounds: (1) that the trial court failed to consider mitigating factors, and (2) that the trial court imposed a sentence outside of the sentencing guidelines without an adequate statement of reasons. *Id*.

The following principles apply to our consideration of whether review of the merits of these claims is warranted. "An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction." *Commonwealth v. Samuel*, 102 A.3d 1001, 1006-07 (Pa.Super. 2014). In determining whether an appellant has invoked our jurisdiction, we consider four factors:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Id*.

Appellant filed both a timely post-sentence motion for reconsideration of his sentence and a notice of appeal. In his motion, Appellant alleged that the court failed to properly consider mitigating factors and to provide an adequate explanation for sentencing above the guidelines. He also raised both issues in his concise statement of errors complained of on appeal. Accordingly, Appellant properly preserved his sentencing challenges. Therefore, we now proceed to determine whether Appellant has raised a substantial question.

Appellant's brief contains a statement of reasons relied upon for his challenge to the discretionary aspects of his sentence as required by Pa.R.A.P. 2119(f). **See** Appellant's brief at 46-52. In his statement, Appellant claims that a substantial question is presented by the fact that the trial court failed to consider mitigating evidence and adequately state its reasons for exceeding the standard range and imposing the statutory maximum penalties. **Id**. We find that this claim raises a substantial question, as it challenges Appellant's alleged excessive sentence in conjunction with an assertion that the court failed to consider mitigating factors. **See Commonwealth v. Raven**, 97 A.3d 1244, 1253 (Pa.Super. 2014). Accordingly, we will consider the merits of Appellant's challenges to his sentence.

The following principles apply to our substantive review of Appellant's claims. "When reviewing sentencing matters, this Court must accord the sentencing court great weight as it is in the best position to view the

defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime." ***Commonwealth v. Ventura***, 975 A.2d 1128, 1134 (Pa.Super. 2009). "We cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court." ***Commonwealth v. Macias***, 968 A.2d 773, 778 (Pa.Super. 2009). Instead, we review the trial court's determination for an abuse of discretion.

> In this context, an abuse of discretion is not shown merely by an error in judgment. Rather[,] the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Antidormi***, 84 A.3d 736, 760 (Pa.Super. 2014).

A trial court's sentence "should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). "When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation." ***Antidormi***, ***supra*** at 761 (citations and quotation marks omitted). Finally, when the trial court has reviewed a presentence investigation ("PSI"), it is presumed that the trial court is aware of and has been informed by all appropriate sentencing factors and

- 27 -

considerations. ***Commonwealth v. Bullock***, 170 A.3d 1109, 1126 (Pa.Super. 2017).

Pursuant to 42 Pa.C.S. § 9781(c), we can vacate and remand only if we find that: (1) the court intended to sentence within the guidelines, but "applied the guidelines erroneously;" (2) a sentence was imposed within the guidelines, "but the case involves circumstances where the application of the guidelines would be clearly unreasonable;" or (3) "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." 42 Pa.C.S. § 9781(c).

The trial court imposed the maximum or aggravated range sentences on all charges except escape. ***See*** Trial Court Opinion, 1/18/19, at 8. Therefore, the sentence must be affirmed unless it is unreasonable. While reasonableness is not defined in the statute, it "commonly connotes a decision that is irrational or not guided by sound judgment." ***Commonwealth v. Walls***, 926 A.2d 957, 963 (Pa. 2007) (citation and quotation omitted).

Appellant argues that his sentence was unreasonable because the court did not adequately consider his low IQ, the fact that he had never been in "serious trouble" before, his mental health history, or that he suffers from a neurocognitive disorder resulting from a traumatic brain injury. ***See*** Appellant's brief at 48-49. Appellant further alleges that the trial court did not state adequate reasons for its deviation from the standard range of the sentencing guidelines. ***Id***.

Appellant has failed to convince us that the trial court's exercise of its broad discretion was unreasonable. The certified record demonstrates that the trial court properly relied on several factors in electing to impose a sentence that exceeded the guidelines, all of which established that the court followed the general principles outlined in § 9721(b), *i.e.*, that the sentence be consistent with the protection of the public, gravity of the offense as it relates to the victim and community, and the rehabilitative needs of the offender. Before issuing its sentence, the court received victim impact testimony from Corporal Kelly, Corporal Kelly's wife, Trooper Seiple, and Colonial Police Chief Roy Seiple. ***See*** N.T. Sentencing Hearing, 8/31/18, at 5-40. Then, the prosecutor argued for maximum consecutive sentences, due to Appellant's failure to take responsibility for his actions or express any remorse. ***Id***. at 40-41.

In fashioning the judgment of sentence, the trial court stated that it had received the sentencing guidelines and had reviewed the PSI, wherein Appellant stated that he reinitiated the traffic stop because he was "annoyed" with Trooper Seiple, that he knew he had not performed well on the field sobriety test, and that he intentionally tried to disarm the police officers when they attempted to arrest him. ***Id***. at 42-43. The court also noted several mitigating factors that it gleaned from the PSI, including: that Appellant had no prior record, received his high school diploma in 2014, had a low IQ, was cooperative with the probation department during the pre-sentence

investigation, had a good upbringing, maintained a "relatively good" relationship with his mother, and acknowledged some responsibility for the crime. *Id*. at 44-45.

The trial court also reviewed psychological and psychiatric evaluations completed by the Commonwealth, defense expert Dr. Gerald Cook, and a school psychiatrist in 2013. The court found all three reports to be consistent, and focused on Dr. Cook's report, concluding that Appellant has "significant mental health problems." *Id*. at 50. However, according to Appellant's own expert, he was not psychotic or delusional at the time of the crime, and his actions were intentional. *Id*. at 49.

The court also received mitigating evidence from Appellant's uncle, who testified that Appellant was "a good kid," up until he was assaulted in the eleventh grade. *Id*. at 56-57. As a result of that incident, Appellant became paranoid and always "thought that somebody was out to get him." *Id*. at 57-58. Appellant chose not to speak at sentencing, but trial counsel did offer argument on his behalf. *Id*. at 68-81. Counsel reiterated the mitigating factors concerning Appellant's age, lack of a prior record, history of mental health problems, and experience as a victim of a prior assault that resulted in a traumatic brain injury. *Id*. at 68-81. Having taken all of this information into consideration, the court then imposed the aforementioned sentence.

Appellant has failed to establish that the sentence was irrational or guided by unsound judgment, because multiple crimes were committed during

this event notwithstanding the brief time in which it took place. Our review confirms that the trial court was aware of, considered, and weighed Appellant's mitigating factors, along with other relevant sentencing factors. Significantly, the court found that Dr. Cook's psychological evaluation was compelling evidence of the danger that Appellant presented to the community. It explained, the report "[sent] a chill through my body," because the doctor found that despite his mental health problems, Appellant "knew what he was doing and intended to shoot these troopers." *Id*. at 82.

Additionally, while the court discussed the details of the assault in detail, it only did so to highlight why this was not an ordinary case of aggravated assault, such that an upward departure from the guidelines was appropriate. Use of the underlying facts in this manner is permissible as long as it was not the only factor relied on when imposing a sentence above the guidelines. *See*, *e.g.*, *Commonwealth v. Fullin*, 892 A.2d 843, 848 (Pa.Super. 2006) (upholding imposition of an aggravated range sentence where one of the grounds for doing so was that case deviated from a "typical" case of the offense under consideration).

The record establishes that the court considered Appellant's mental health history in detail, but found this mitigating factor and others were outweighed by the seriousness of the crime and the impact Appellant's actions had on the community. Although Appellant received an extreme sentence by virtue of the fact that the aggregate sentence exceeds the average lifespan,

the sentence fashioned was fully informed by all of the facts and circumstances presented in the PSI report, multiple mental health evaluations, and the victim and defense testimony provided at sentencing. Importantly, while we may have sentenced Appellant differently, our standard of review does not give us license to reweigh those mitigating circumstances against the aforementioned factors. **Macias**, **supra** at 778. The trial court may have reached the limits of its discretion, but on the record before us we cannot reach the conclusion that the trial court exceeded its authority.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/2020